**Exhibit A**

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

INCREDIBLE FOODS GROUP, LLC,

Claimant,

-- against --                    DEMAND FOR ARBITRATION

UNIFOODS, S.A. de C.V.,

Respondent.

Claimant Incredible Foods Group, LLC ("IFG"), for its demand for arbitration against Respondent Unifoods, S.A. de C.V. ("UF") respectfully states:

**The Parties**

1. IFG is a limited liability company organized under the laws of the State of Connecticut that maintains its principal place of business at 400 Main Street, Stamford, CT06901. IFG's telephone number is 203-353-9356 and its e-mail address is ccordulack@ifgr.com. Its attorney is J. Joseph Bainton of BaintonLynch LLP, 767 Third Avenue, New York, NY 10017, whose telephone number is 212-201-5705; facsimile number is 212-704-8330; and e-mail address is bainton@baintonlynch.com.

2. UF is a limited liability company organized under the laws of Mexico that maintains its principal place of business at Poniente 122#497, Colonia Industrial Vallejo, Mexico City, C.P. 02300.  UF's telephone number is 011 52 1 461 598 7607 and its e-mail address is jpgrovas@yahoo.com.  Its attorney is John W. Wood of John W. Wood, P.C., 4900 Woodway Drive, Suite 1110, Houston, TX 77056, whose telephone number is 713-529-7373; facsimile number is 713-529-7378; and e-mail is jw@johnwoodlaw.com.

**The Parties Agreement to Arbitrate**

3. IFG and UF entered into a certain Sub-License Agreement effective as of January 1, 2009 (the "Agreement"). A copy of the Agreement is annexed hereto as Exhibit A.

4. Paragraph 25 of the Agreement provides that the Parties will submit all disputes relating to the Agreement "to final and binding arbitration pursuant to the Commercial Rules of the American Arbitration Association in New York City and administered by the American Arbitration Association." This demand for arbitration is being made pursuant to that paragraph of the Agreement.

**Nature of the Agreement**

5. UF is the Sublicensor of certain trademarks and proprietary recipes for (a) fruit drinks and (b) dairy products (collectively the "UF Products").

6. Pursuant to the terms of the Agreement, UF granted IFG a "sublicense" to market UF products imported from Mexico and/or manufactured in the United States as well as to cause UF Products to be manufactured pursuant to UF recipes at UF approved manufacturing facilities recommended to UF by IFG such UF Products to then be distributed by IFG bearing UF trademarks within a geographic territory within the United States defined in paragraphs 2.3 and 2.3.1 of the Agreement, as amended.

7. Pursuant to Paragraph 4.1 of the Agreement, UF had the duty to review and to conduct an on-site inspection of any U.S. manufacturer recommended by IFG to determine if it was "able to meet the Quality Control standards and Product Specifications and comply with the Protective Clauses [of UF]."

8. Pursuant to Paragraph 4.2 of the Agreement, UF had the duty to provide IFG "with a base US Manufacturer's Agreement for US Manufacturers that protects [UF's] interests

2

relative to UF Products including, without limitation, the Quality Control Standards, Product Specifications, Brand Rights and Protective Clauses pursuant to paragraph 3.2 of this Agreement."

9. Pursuant to Paragraph 4.3 of the Agreement UF had the duty to provide "approved US Manufacturers with specifications and recipes ("Product Specifications") such that the US Manufacturers can produce UF Products consistent with UF standards."

**UF's Destruction of IFG's Chipilo Business**

10. IFG's predecessor in interest introduced UF to New Delights Corporation ("NDC") of Red Hook, New York, which manufactured excellent Crema Mexicana in both espesa and semi-espesa formulations, which used NDC's proprietary stabilizer, and offered UF the opportunity to market this Crema Mexicana using the UF "Chipilo" trademark. As part of this transaction, NDC shared with UF the recipes it was using to manufacture its Crema Mexicana.

11. UF was grateful for this opportunity to break into the North American espesa market initially with plans to subsequently enter the semi-espesa market and consented to the use of its Chipilo trademark on espesa and semi-espesa manufactured by NDC. NDC became an approved manufacturer for Chipilo espesa and semi-espesa. Espesa has a thicker consistency than semi-espesa.

12. During the period between December 2007 and February 2009, IFG (and its predecessor in interest) enjoyed great commercial success in marketing the Chipilo espesa by the end of the period growing sales to $20,000 per month and finalizing plans for introducing semi-espesa to the market. This success was based principally upon two things. The taste of the Chipilo espesa and the fact that NDC manufactured espesa with unwavering

3

consistency.  In other words, when a customer purchased Chipilo espesa, the customer had an expectation as to what would be in the container and that expectation was never disappointed.

13. As a consequence, IFG's regular and consistently growing sales of Chipilo espesa became a regular source of cash flow upon which it relied in its business plan to help fund its expansion of Crema Mexicana and other UF products within the North American territories granted to it under the Agreement.

14. NDC manufactured the Chipilo products in batches of 500 to 1,000 gallons.

15. In or about January of 2009, UF came to the conclusion that it would like to market in areas of North America not being serviced by IFG (or anybody else) Chipilo espesa and semi-espesa as "kosher" and identified Brookshire Grocery Company ("BGC"), a grocery retailer with dairy manufacturing facilities in Texas whose manufacturing processes were kosher, as a place to manufacture these products.

16. To IFG selecting this facility was a curious choice, because it insisted on a minimum order from UF of 5,000 gallons, five to ten times the amount of product IFG was ordering to meet the needs of markets IFG had developed.

17. IFG questioned how UF was going to sell on day one in new markets five to ten times the volume it was selling in developed markets.

18. UF shared the existing Chipilo recipes with BGC and was advised that the stabilizer that NDC was using was not kosher.

19. UF then instructed IFG and NDC to substitute a TIC gum as a stabilizer in its Chipilo products.

20. IFG logically assumed – incorrectly – that UF had tested the new recipe before ordering it to change the highly successful recipe it had been using.

21. IFG argued against changing a very successful product, but UF mandated the change.

22. IFG and NDC did as they were instructed and shipped Chipilo espesa and semi-espesa manufactured pursuant to the new recipes to IFG's devoted customers.

23. The "new" Chipilo products were nothing short of a disaster.

24. Their texture was uniformly wrong and completely unpredictable.

25. IFG reported its customers' complaints to UF and was told by UF to continue to use the new recipes.

26. UF then over a period of months, tweaked the recipe, but stuck by its decision to use the TIC gum as a stabilizer.

27. IFG was beyond distraught was it watched its Chipilo Crema Mexicana market being slaughtered.

28. IFG ultimately consulted with the manufacturer of the TIC gum that UF insisted as using as a stabilizer and was told that the gum "was not intended for this use."

29. The Chipilo espesa and semi-espesa made and sold by UF in Mexico was and is comparable in taste, quality and consistency with the Chipilo espesa and semi-espesa manufactured by NDC and distributed by IFG before UF forced them to change to an untested recipe.

30. Upon information and belief, UF never used TIC gum as a stabilizer in Crema Mexicana it manufactured in Mexico.

31. In August 2009 UF finally authorized IFG and NDC to return to the original NDC Crema Mexicana recipes.

5

32. By then it was too late to salvage the damage in the marketplace caused by the UF mandated recipe change that produced months of unmerchantable Chipilo Crema Mexicana.

33. By forcing IFG to change to this untested recipe that consistently produced unmerchantable espesa and semi-espesa, UF breached Section 4.3 of the Agreement.

**UF Destroys IFG Bonafina Fruit Drink Business**

34. One of the other UF products that the Agreement contemplates that IFG will exploit in its territories is Bonafina fruit drinks.

35. IFG introduced UF to Diamond Drinks of Williamsport, Pennsylvania ("Diamond").

36. UF approved Diamond as an approved US Manufacturer. *See* Agreement, Exhibit 3.2.

37. Although it approved Diamond, in breach of its obligations under Paragraph 4.2 of the Agreement, UF never provided IFG with a "base US Manufacturer's Agreement."

38. UF approved Diamond only after its Technical Director, Miguel Ruiz, inspected the Diamond plant in May 2011 and provided recipes.

**The Bulging and Leaking Bottles Problem**

39. According to UF, Bonafina fruit drink has a shelf life of at least six months.

40. Diamond first manufactured Bonafina fruit drink according to the UF recipe in August 2011.

41. Pallets of the Bonafina fruit drink were shipped to IFG customers.

42. By September 2011 customers were calling IFG complaining of spoilage because due to pressure inside some of the bottles to bulge; their caps to leak; their contents to overflow and those overflowing contents in turn to spoil much of the balance of a case or pallet thereby rendering the entire case or pallet unmerchantable.

43. IFG immediately reported this serious problem to UF.

44. UF provided little or no technical assistance.

45. IFG undertook to solve the "recipe problem" that was causing the Bonafina bottles to leak with the help of outside sources.

46. It was not an easy task that led to a ready solution.

47. It took until July 2013 to solve the problem.  The problem can be simply described.  The UF recipe contained calcium lactate and the Diamond facility contained many yeast contamination sources.

48. The yeast reacted with the calcium lactate creating pressure within the bottles causing the bottles to bulge and leak.

49. IFG removed the calcium lactate from the recipe and informed UF that it had finally solved the problem.

50. UF informally approved the removal of the calcium lactate and later formally approved it when it approved other recipes for Bonafina drinks not containing calcium lactate.

51. Accordingly by July 2013 the "bulging and leaking bottle problem" was solved.

52. During the period from September 2011, when the problem first presented itself, until July 2013, when the problem was finally resolved (no thanks to UF), the reputations of Bonafina and IFG were severely damaged in the marketplace and during this period IFG not only lost the cost of damaged product, but more significantly lost sales, market share and market position.

53. When UF first inspected Diamond pursuant to Paragraph 4.1 of the Agreement, it should have observed that Diamond's operations produced a plethora of yeast contamination sources.

54. Upon such observation, UF should have done one of two things. Either it should not have approved Diamond pursuant to Paragraph 4.1 or, if – as it did – approve Diamond, it should have modified its recipe to remove the calcium lactate in order to comply with its obligations under Paragraph 4.3 of the Agreement.

55. Obviously removing calcium lactate from the UF recipe was not material to UF, because it readily agreed to do so in July 2013 once IFG identified it as the cause of the bulging and leaking bottles problem.

56. Accordingly, UF breached its obligations to IFG under paragraphs 4.1, 4.2 and 4.3 of the Agreement.

**UF's Breach of Paragraph 4.6 of the Agreement**

57. At the beginning of the Bonafina fruit drink production, UF provided IFC with a very limited number of flavors, namely orange.

58. This resulted in Bonafina receiving very limited shelf/display space in stores as compared to its competitors, which offered many more flavors that in turn required significantly more shelf space to display.

59. Pursuant to paragraph 4.6 of the Agreement addressing "New UF Products," IFG sought UF's permission to expand the Bonafina line by adding a number of additional flavors, namely Apple, Citrus, Grape, Mango and Strawberry.

60. Technically, this was not a difficult task. It involved only purchasing standard concentrate from Beverage Flavors International.

61. It took UF over a year to respond to IFG's request.

62. Once approved, the new flavors represented 75 per cent of IFG's sales of Bonafina fruit drinks.

63. This inexplicable and unwarranted delay, caused IFG to unnecessarily lose sales.

**Damages**

64. UF's complete abdication of its responsibilities for the Chipilo and Bonafina recipes has destroyed IFG's business.

65. IFG has had to pay for manufacturing and shipping unmerchantable Chipilo and Bonafina products.

66. IFG has had to pay the costs of traveling and entertaining customers within its territories which received unmerchantable Chipilo and Bonafina products in order to maintain or attempt to maintain IFC's relationships with them.

67. IFG has had to pay the costs and expend the time necessary to "fix" the UF recipes.

68. IFG has had to pay its own overhead without any or limited income due to the defects in the UF recipes and UF's complete failure to fix them.

69. Now that IFG has done UF's job and fixed UF's recipes, it is without working capital to exploit the repaired recipes and to benefit from its rights under the Agreement.

70. Depending upon what assumptions the Arbitrator finds most reasonable, the value of IFG's business that UF has destroyed ranges between $15 Million and $43 Million.

**Unjust Enrichment**

71. As a result of IFG's efforts, UF has been provided with (a) manufacturers in the Northeast capable of manufacturing merchantable Chipilo and Bonafina products; recipes for those products; and the identities of customers of those products.  In other words, with IFG's capital and sweat equity, IFG has established a North American business for UF products where none existed before.

72. Accordingly, UF has been unjustly enriched in a sum ranging between $15 Million to $43 Million.

WHEREFORE IFG requests a monetary award against UF in a sum that the Arbitrator deems just and proper, together with its Attorneys' fees and the costs of this Arbitration.

Dated:  New York, New York
        October 22, 2013

BAINTON LYNCH LLP

By: _____
        J. Joseph Bainton
*Attorneys for Claimant*
767 Third Avenue
New York, NY 10017
Telephone:  (212) 201-5705
e-mail:  bainton@baintonlynch.c0m

10

# Exhibit A

## SUB-LICENSE AGREEMENT

This Sub-License Agreement ("Agreement") is made effective as of January 1, 2009, by and between INCREDIBLE FOODS GROUP, LLC, ("IFG" or "Sub-Licensee") a Connecticut Limited Liability Company with its principal place of business at 400 Main Street, Stamford, Connecticut 06901 and UNIFOODS, S.A. de C.V., ("UF" or "Sub-Licensor"), a Mexican corporation with its principal place of business at Poniente 122 # 497, Colonia Industrial Vallejo, México City, C.P. 02300 (collectively, "the Parties").

WHEREAS, UF has the license to manufacture and market in the United States of America, dairy and beverage products ("Products"), under trade names and registered trademarks ("Brands" or "Trademarks") that are the property of "PRODUCTOS DE LECHE, S.A. de C.V., a Mexican corporation" ("PDL" or "Brand Owner"), pursuant to a License Agreement between UF and PDL ("the UF-PDL License Agreement"); and

WHEREAS UF does and has done business in the United States of America through Bonafina Inc ("BFI"), a Texas Corporation, and,

WHEREAS, UF seeks an additional Sub-Licensee to manufacture, market, distribute and sell the Products within a certain defined territory within the United States, and UF, as a licensee of Brand Owner has the authority to grant a sub-license to Sub-Licensee for the manufacture, marketing, distribution and sales of the Products within the United States; and,

WHEREAS, IFG has worked with UF and with PDL, over the past three (3) years, and the partners in IFG have done an important investment into this relationship to date, aware that the investment was their own risk, and without assurances or guarantees by UF or PDL, of any sort, Sub-Licensee has acted with full knowledge that its investment did not, and does not, create a relationship of partnership, joint venture, agency or employer-employee status between the Parties; and,

WHEREAS, UF as Sub-Licensor respects the capabilities of IFG the Sub-Licensee, UF has invested, as a loan to Sub-Licensee, an important investment to support Sub-Licensee's efforts in developing the manufacturing, marketing and distribution capabilities necessary to comply with this Agreement, aware that the investment was made without assurances or guarantees by IFG, of any sort other than its stated intent to repay said loan.

WHEREAS, the Parties, wish to enter into this Agreement for the profitable development and expansion of the sale of the Products and the development of the Brands within the agreed territory; and,

WHEREAS, Sub-Licensor wishes to have a Sub-Licensee contract with US manufacturers, at Sub-Licensee's expense with the split of expenses between the Sub-Licensor and Sub-Licensee to be agreed upon by the Parties at the time for the manufacture of the Products in the United States, and wishes Sub-Licensee to develop marketing and distribution channels for the sale of the Products to the ultimate consumers.

NOW THEREFORE, the Parties enter into this Agreement subject to the following terms and conditions.

1.    Representations

1.1    Sub-Licensor and Sub-Licensee, represent and warrant to each other that each respective Party: a) is an entity duly formed and in good standing under the laws of its respective jurisdiction, and has the legal capacity to enter into this Agreement; b) that this Agreement is a valid and legal agreement binding on the respective Parties and enforceable according to its terms; c) that this Agreement does not conflict, in any way, with any agreement previously entered into by either of the respective Parties; and d) that each person signing this Agreement, on behalf of the respective Party, is duly authorized and has the legal capacity to execute and deliver this Agreement.

1.2    Sub-Licensor warrants that it has the right to distribute the Products and the Brands within the United States of America and which Products and Brands are the subject of the UF-PDL License Agreement and are more particularly described in Exhibit 1.2 attached to this Agreement ("UF Products").

1.3    Sub-Licensee warrants that it has the financial and operative capability and management team necessary to effectively work independently and with the Sub-Licensor to develop the manufacturing, marketing and distribution channels necessary to offer the Products for sale to the consuming public.

1.4    Sub-Licensee warrants that, at all times, it will use commercially reasonable efforts to comply with and to cause the US Manufacturers to comply with all applicable laws, regulations and orders relating to the manufacture, processing, labeling, storage, sale and distribution of the Products, and agrees to indemnify and hold Sub-Licensor harmless from all liability, penalties, fines, sanctions, costs, expenses, or damages relating to, or arising out of any failure of Sub-Licensee to do so.

1.5    Sub-Licensee warrants that it will use commercially reasonable efforts to assure that the Product supplied by it to the general public shall be manufactured, produced, blended, stored, packaged, and shipped strictly in conformance with the Quality Controls, Product Specifications and the Protective Clauses set forth in paragraph 3.1.

2

1.6    Sub-Licensee acknowledges that the Brands and Trademarks, as well as any intellectual property rights associated therewith, are, and shall remain the property of PDL, subject to the license from PDL to UF.

2.    Sub-License

2.1    Award of Sub-License.  Subject to the terms and conditions of this Sub-License Agreement (the "Sub-License"), Sub-Licensor hereby grants to Sub-Licensee, a limited, personal, non-transferable, exclusive Sub-License to manufacture, market, distribute and sell the Products within the territory described herein.

2.2    Term.  The Term of the Sub-License shall begin on January 1, 2009, and continue for a period of five (5) years and, at Sub-Licensee's option, for additional five year periods, at its discretion.  Unless Sub-Licensee notifies Sub-Licensor of its intent not to extend this Sub-License for an additional five (5) year period six months prior to the expiration of the then current period, this Agreement will be automatically extended for an additional five (5) year period at the end of the then current period.

2.3    Territory.  This Sub-License shall only apply to and is restricted and limited to any geography in which the Sub-Licensee sells directly or indirectly or manufactures UF Products. The primary territory of the Sub-Licensee consists of the States of New York, New Jersey and Connecticut as well Eastern Pennsylvania and Delaware as well as the City of Chicago and its surrounding metropolitan area or "Greater Chicago" ("the Territory").   The possible award of additional territory to Sub-Licensee's Territory shall be at Sub-Licensor's exclusive discretion, taking into account factors such as Sub-Licensee's performance under this Agreement, and the availability of territory in areas not otherwise awarded to third parties ("Other Exclusive Territory") or reserved for Sub-Licensor ("Sub-Licensor's Reserved Territory") as reflected in Exhibit 2.3, which shall be kept current by the Sub-Licensor.

2.3.1 Secondary Territory.  The Sub-Licensee may also sell directly or indirectly or manufacture UF Products in geographies that are not part of its Territory as long as those geographies were not part of an Other Exclusive Territory or a Sub-Licensor's Reserved Territory ("Secondary Territory").  Before the Sub-Licensor adds a distributor or additional sub-licensee in this Secondary Territory, the Sub-Licensor agrees that it will talk with the Sub-Licensee to determine the best overall solution for properly covering this geography, giving due consideration to the Sub-Licensee's existing efforts in this particular geography.

2.4    Exclusivity within Territory.  Sub-Licensor will not operate in, and will not use any other entity, person or company, other than Sub-Licensee, to manufacture,

3

market, distribute and sell Products in the Territory while this Agreement remains in force, and will refer any parties who may express an interest in manufacturing, distributing, selling or purchasing UF Products within the Territory, to the Sub-Licensee. Any additions to the Territory must be in writing, signed by both parties and, if additions are made, the description of the additional territory shall be included in a revised Exhibit 2.3 attached to this Agreement.

    2.5    Rights to Brands. Sub-Licensee acknowledges that it has no rights in or to the Products, Brands, trade names, logos, Trademarks or copyrights described herein, except as provided in this Agreement and acknowledges that it shall not acquire any rights in the Products, Brands, trade names, logos, Trademarks or copyrights or any rights to their use other than as provided herein, and that all goodwill arising out of any use of the Products and Brands by, through, or under Sub-Licensee shall inure solely to the benefit of Sub-Licensor and/ or the Brand Owner. Upon termination of this Sub-License Agreement for any reason, all sub-licenses to use the Brands as described herein shall also automatically terminate. Following the termination of this Agreement, Sub-Licensee, subject to paragraph 13.2.5, shall immediately discontinue use of any Products or Brands and shall promptly destroy, or at Sub-Licensor's option, forward to Sub-Licensor, all advertising and promotional materials, displays, order forms, signage, and all other materials that contain any Trademarks or Brands licensed under this Agreement.

    2.5.1 Sub-Licensee agrees to use always the Trademarks precisely as its distinctive brands. Sub-Licensee shall always use the brands as they were registered.

    2.5.2 Sub-Licensee shall not, without prior written consent of Sub-Licensor, use in relation to the Products, in the trademark sense, or corporate name, any word, symbol, or combination thereof, in which Sub-Licensor claims trademark rights.

    2.5.3 Sub-Licensee shall not, under any circumstances, apply for the registration of any of the trademarks, or any of Sub-Licensor's trademarks, trade names, patents, and industrial designs, or similar trademarks or trade names and copyrights.

    2.5.4 Sub-Licensee shall not directly or indirectly or through third parties contest the validity of the present or future trademark, trade names, industrial designs, or any other industrial or intellectual property rights owned by Sub-Licensor. This undertaking refers also to any other Sub-Licensor's distinctive signs and shall apply throughout and after the term of this agreement.

4

2.6    Notice of Infringement.    Sub-Licensee shall immediately notify Sub-Licensor of any infringement, misappropriation, or violation of any Trademark or intellectual property rights of Sub-Licensor or PDL within the Territory that comes to Sub-Licensee's attention.    Sub-Licensee shall not infringe or violate, and shall use commercially reasonable efforts, working with the Sub-Licensor, at Sub-Licensor's expense, including any legal action if necessary, to preserve and protect Sub-Licensor's or PDL's interest in all such Trademarks and Brands and intellectual property rights within the Territory.  Notwithstanding anything to the contrary in this Paragraph, Sub-Licensor shall have the right, including the right to file any legal action necessary, at its option, to directly preserve and protect its interests, or the interests of the Brand Owner, including without limitation, rights in the Trademarks and Brands and other confidential information provided by Sub-Licensor to Sub-Licensee.

2.7    Revocation. Sub-Licensee's rights under this Agreement may be revoked in the event of the occurrence of any events which may give rise to termination as set forth in Paragraph 13 below.

2.8    Independent Contractor.  Sub-Licensee is an independent Contractor and nothing in this Agreement shall be deemed to create a relationship of agency, partnership, joint venture or employer-employee between Sub-Licensor and Sub-Licensee.  Upon written consent of the Sub-Licensor, and at Sub-Licensor's absolute discretion, Sub-Licensee may act as Sub-Licensor's agent for US Manufacturers outside of Sub-Licensee's Territory pursuant to terms which would be set forth in a written agreement of representation to be entered into at a later date and prior to Sub-Licensee's acting as Sub-Licensor's agent.

3.    Duties of Sub-Licensee - US Manufacturing

3.1    US Manufacturers. Sub-Licensee will identify potential US Manufacturers for Sub-Licensor's approval who are capable of producing the UF Products at a level of quality consistent with and subject to the quality control and product specifications established by PDL and Sub-Licensor related to the UF Products in Mexico and as adapted as necessary to satisfy unique US requirements ("the Quality Controls and Product Specifications") as described in Exhibit 3.1.  Within thirty (30) days of its identification and after inspection and evaluation, Sub-Licensor shall, in its sole discretion, approve or deny the Sub-Licensee's use of any potential US manufacturer so identified.

3.2    US Manufacturer Agreements.  Upon selection and approval of a US Manufacturer, Sub-Licensor and Sub-Licensee will contract with each selected US Manufacturer pursuant to a written agreement between Sub-Licensor, Sub-Licensee and the US Manufacturer ("US Manufacturer's Agreement") unless otherwise agreed to by the

5

Sub-Licensor in writing.   The US Manufacture's Agreement will be between Sub-Licensor, Sub-Licensee and the US Manufacturer and will include clauses for compliance with Sub-Licensor's Quality Controls and Product Specifications and for protection of Sub-Licensor's Confidential Information regarding the sub-licensed Brands, Trademarks, formulas and recipes (the "Protective Clauses"). The Quality Controls and Product Specifications are more particularly described in Exhibit 3.1 attached to this agreement. The US Manufacturer's Agreements will be in form and substance satisfactory to Sub-Licensor and Sub-Licensee.  US Manufacturers that have already been approved by the Sub-Licensor for which the Sub-Licensee has responsibility with Sub-Licensor support if necessary, as noted in Exhibit 3.2, are listed in Exhibit 3.2 attached to this agreement. Sub-Licensor and Sub-Licensee will use commercially reasonable efforts to enter into a US Manufacturer's Agreement with each of the already approved US Manufacturers listed in Exhibit 3.2 within sixty days from the date this Sub-License Agreement is signed by all Parties or within sixty days from the date on which the Base US Manufacturer's Agreement defined in Paragraph 4.2 is available to Sub-Licensee, whichever is later.

      3.3    US Manufacturers Interface. Sub-Licensee will be responsible for interfacing with approved US Manufacturers for which it is responsible and coordinating all operational activities related to the manufacture, production, distribution and sale of the UF Products sold to its Customers within the Territory.

      3.4    Monitoring US Manufacturers. Sub-Licensee shall use commercially reasonable efforts (efforts that are usual and normal for a company acting in good faith to do in a similar situation, including periodic visits to the US Manufacturer's work place and will promptly conduct an investigation should Sub-Licensee become aware of any facts evidencing the need for such investigation) in monitoring the activities of US Manufacturers.  Sub-Licensee shall notify Sub-Licensor, immediately, of any potential issues prior to taking specific action, to assure that the Sub-Licensor's interests are protected and the Quality Controls, Product Specifications and Protective Clauses are enforced.

      3.5    Inspections.  The US Manufacturer Agreements will provide that Sub-Licensee and/or Sub-Licensor have the right to perform quality inspections and/or audits of the selected US Manufacturers from time to time, covering the production process for UF Products.  A minimum notice of five (5) days will be given to the US Manufacturer prior to performing such an audit and/or visit.

      3.6    Preventive Measures.  The US Manufacturer's Agreements will provide that Sub-Licensee and the US Manufacturer will exert their collective and individual commercially reasonable efforts to prevent, troubleshoot and resolve any problems arising from the US Manufacturers' performance under the US Manufacturer's Agreement.  Sub-Licensee will advise Sub-Licensor of any problems which may have significant economic impact and receive any input which Sub-Licensor may offer.

6

3.7    Indemnity.  Sub-Licensee hereby agrees to defend, indemnify and hold harmless Sub-Licensor, PDL, their affiliates  and their former and current directors, officers, administrators, shareholders,  employees, attorneys, agents, representatives, successors and assigns ("the indemnified parties") , from and against  any claims, losses, harm, liabilities, costs and expenses including court costs and reasonable attorneys' fees, arising from Sub-Licensee's negligence or breach of this Agreement, or arising from  any claim or law suit against the indemnified parties derived from any UF Products manufactured or sold by Sub-Licensee.

3.8    US Manufacturers  Agreement  Indemnity.  The  US  Manufacturer's Agreement shall provide that the US Manufacturer and Sub-Licensee, shall jointly and severally, indemnify  Sub-Licensor, PDL, their affiliates and their former and current directors, officers, administrators, shareholders, employees, attorneys, agents, representatives, successors and assigns ("the indemnified parties"), from and  against any claims, losses, harm, liabilities, costs and expenses including court costs and reasonable attorney's fees, arising from  claims or law suit  against the indemnified parties derived from the manufacture, distribution or sale of the UF Products.

3.9    Insurance. The US Manufacturer's Agreement shall contain a requirement that the US Manufacturer obtain an Insurance Policy in an amount and terms of coverage no less than Five (5) million dollars in coverage or such other amount as may be agreed to between the Sub-Licensor, Sub-Licensee and the US Manufacturer.   Agreement between the Sub-Licensee and the Sub-Licensor on the terms of coverage is a condition precedent to Sub-Licensor's approval of the particular US Manufacturer. The coverage shall  name  the Sub-Licensor and PDL (as additional insureds), and name the Sub-Licensee and the US Manufacturer as insured against any liabilities arising from the manufacture of the Product by the US Manufacturer (specifically including product liability coverage).  Proof of such insurance policy shall be attached as an exhibit to the US Manufacturer's Agreement by the Sub-Licensee and the US Manufacturer.  Sub-Licensee shall furnish Sub-Licensor, within fifteen days or such other period as is acceptable to the Sub-Licensor of entering into any US Manufacturer's Agreement, certificates of insurance showing compliance with the terms of this paragraph and which warrant that said insurance will not be suspended, terminated, modified, or canceled, without at least 30 days prior written notice to Sub-Licensor.

3.10   Reservation of Rights.   Each US Manufacturer's Agreement will include provisions awarding Sub-Licensor, upon termination of this Agreement for any reason, the right, at Sub-Licensor's discretion, to negotiate directly with the particular US Manufacturer for the continuing production of the Products. In addition, Sub-Licensor reserves the right to provide the US Manufacturer's Agreement to be used by Sub-Licensee and reserves the right to contract directly with the US Manufacturers to provide the Products to Sub-Licensee.

7

3.11 US Manufacturer's Agreement Terms.  Notwithstanding any of the terms specified in this Section 3 above or Section 4 below or elsewhere in this Agreement, with the written agreement of the Sub-Licensor, the requirement for a US Manufacturer's Agreement, itself, or any of the specific terms specified in this Agreement, may be waived or modified for any approved US Manufacturer.   Sub-Licensee will strive to establish US Manufacturer's Agreements with approved US Manufacturers that it manages consistent with the goals set forth in this Agreement, working in conjunction with the Sub-Licensor, as necessary, to gain the acceptance of the US Manufacture to the desired terms.  In no case will the terms required for a US Manufacturer's Agreement for an approved US Manufacturer that is managed by the Sub-Licensee, as noted in Exhibit 3.2, be required by the Sub-Licensor, if those terms cannot be reasonably negotiated by the Sub-Licensee and the Sub-Licensor working together on an approved US Manufacturer. Likewise, the requirement to enforce any terms in the US Manufacturer's Agreement for a US Manufacturer managed by the Sub-Licensee shall not exceed the level of enforcement related to the Manufacturer's Agreements for US Manufacturers managed by the Sub-Licensor or BFI.

3.12 Sub-Licensor will take a decision to approve or not, the US Manufacturer suggested by IFG, according with US Manufacturer prestige and background.

4.      Duties of Sub-Licensor - US Manufacturing

4.1     Approval of U.S Manufacturers.  Sub-Licensor will review, including an on-site inspection of any proposed US Manufacturer, and approve, in its sole discretion, those US Manufacturers recommended by the Sub-Licensee that are able to meet the Quality Control standards  and Product Specifications and comply with the Protective Clauses.

4.2     Protection of Sub-Licensor's Interests.  Sub-Licensor will provide Sub-Licensee with a base US Manufacturer's Agreement for US Manufacturers that protects Sub-Licensor's interests relative to UF Products including, without limitation, the Quality Control standards, Product Specifications, Brand rights and Protective Clauses, according to paragraph 3.2 of this Agreement.

4.3     Product Specifications.  Sub-Licensor will provide approved US Manufacturers with specifications and recipes ("Product Specifications") such that the US Manufacturers can produce UF Products consistent with UF standards.

4.4     Labeling, Packaging and Marketing.  Sub-Licensor will provide Sub-Licensee art work and ready to print labels and packaging for the Products at Sub-Licensee expense. Sub-Licensor will also provide Sub-Licensee art work and ready to print layouts for any and all marketing materials Sub-Licensor develops for the Products.

8

Sub-Licensor also will approve, in advance, all labeling, packaging, marketing materials and advertising for any of the Products offered for sale by Sub-Licensee under this Agreement that are developed by the Sub-Licensee. Sub-Licensor shall provide appropriate labeling information and existing design for UF Products to enable Sub-Licensee, or the US Manufacturer, to produce the Product within the Territory. Sub-Licensor will not bear any costs in the production, manufacturing, labeling, marketing or sales of the Product within the Territory unless agreed to in advance with Sub-Licensee. All Product manufactured, distributed or sold pursuant to the terms of this Agreement shall: (i) bear Brand Owner's Brands; and, (ii) comply with any and all applicable labeling requirements of the Territory governmental entities, federal state, and local. Sub-Licensor shall approve, in writing and prior to production, the design of all labeling, packaging, marketing materials and advertising for any of the Products offered for sale by Sub-Licensee.

4.4.1 To the extent that labeling, packaging, marketing materials and advertising are developed and paid for by the Sub-Licensee, the Sub-Licensor agrees to compensate the Sub-Licensee or share the costs with the Sub-Licensee to the extent that Sub-Licensor, BFI, or another potential sub-licensee utilizes them.

4.5 Compliance with Quality Contents. Sub-Licensor may conduct periodic plant visits, as needed, to review a co-packer's records to assure that required Quality Controls and Product Specifications and Protective Clauses are continually met.

4.6 New UF Products. The Parties may agree, at their discretion, to develop new products bearing the Brand ("New UF Products") or to modify existing Products ("Modified Existing Products"), pursuant to product specifications developed by Sub-Licensor or PDL. Should New UF Products be developed or modifications to existing Products be made as a consequence of Sub-Licensee interest, all related costs, including manufacturing, testing, and evaluation of the New UF Products and/or Modified Existing Products ("Development Costs"), incurred by the Sub-Licensee and/or the US Manufacturer, will be approved by Sub-Licensor and its costs will be a Sub-Licensee responsibility, unless New UF Products come from Sub-Licensor or are exported by Sub-Licensor. Sub-Licensee agrees that the product specifications for any New UF Product or for any Modified Existing Product would be the property of Sub-Licensor or of PDL and would be part of Sub-Licensor's Confidential Information.

4.7 Pricing of UF Products and New UF Products. To the extent that Sub-Licensee purchases UF Products or UF ingredients ("UF Ingredients") from Sub-Licensor or BFI, the purchase price that the Sub-Licensee must pay ("Sub-Licensee's Price") shall be no higher than the lowest price at which the Sub-Licensor or BFI, as the case may be, sells such same UF Products or UF Ingredients to any other sub-licensee, BFI or any other US Manufacturer. In the event that the Sub-Licensor believes that in a particular situation it should be allowed to sell UF Products or UF Ingredients to another party at a

9

price lower than the Sub-Licensee's Price, Sub-Licensor will request the approval of the Sub-Licensee to do so.  The Sub-Licensee agrees to consider the request in good faith and provide the Sub-Licensor with a written position on his request within 10 days of the Sub-Licensor's request.

5.      Duties of Sub-Licensee - Sales & Marketing

5.1      Sales Organization.  Sub-Licensee, at its own expense, with input from Sub-Licensor, shall develop a sales force and a plan to distribute and sell the Products within the Territory.

5.2      Sales Campaigns.  Sub-Licensee will obtain written approval from the Sub-Licensor prior to agreeing to or implementing any UF Sales Campaigns.

5.3      Marketing.  Sub-Licensee will develop a marketing strategy and present to the Sub-Licensor for review and approval those elements of the strategy that could potentially affect the Brand or image of the Products.  The Sub-Licensee shall participate with Sub-Licensor in regularly scheduled discussions, initially monthly, to review and suggest ways to improve the sales of the Products within the Territory.

5.4      Sales Reports.  Sub-Licensee, during each month while this Agreement is in force, and at the same time when providing royalty reports, shall provide Sub-Licensor an accounting showing the number of units sold by Product and the net selling price for each of the Products sold for the preceding month.  The accounting shall show totals for each Product and, to the extent such information is available to the Sub-Licensee, for each state and the metropolitan area of Chicago, individual sub-totals for each product showing the number of units sold, actual and forecasted sales, and the Sub-Licensee's selling price charged for each Product being distributed ("Monthly Sales Reports").

5.5      Annual Product Sales Goals.  The Parties hereby agree to Annual Product Sales Goals for the calendar year 2011 which are more particularly described in Exhibit 5.5 attached to this Agreement.  Commencing in December of 2011, the Parties shall meet yearly, during the month of December, to review past sales and, in good faith, set the sales goals for any Product which is subject to this Agreement ("Annual Product Sales Goals") for the next calendar year, based on explicit assumptions for each Product that supports the attainment of the established Annual Product Sales Goals ("Annual Product Sales Goals Assumptions").  The Annual Product Sales Goal will be expressed in terms of the total $US of Product sold.  In the event the Parties should fail to agree in setting Annual Product Sales Goals for the next calendar year, said goals shall be the Annual Product Sales Goal Forecast for the then current year, plus an increase of twenty percent (20%) or at least as much as the category growth for the related UF

10

Products...for example, non-carbonated fruit drinks and flavored drinks in the Mexican marketplace

    5.6    Annual Product Sales Goals Review. Along with each monthly royalty payment, Sub-Licensee will have delivered to Sub-Licensor a monthly report showing for each Product the actual sales for the month, the projected sales for the month, the cumulative total for the year and the projected total for the year. In the month of February of every year during the term of this Agreement, the Parties shall meet to determine whether the Annual Product Sales Goals for the preceding year have been met, taking into consideration not only the specific goals related to each Product, but also whether the assumptions that supported the established "Annual Product Sales Goals Assumptions" materialized.

    5.7    Non-Competition. Sub-Licensee will exert its best efforts and use its contacts and expertise to find Customers for UF Products within its Territory. During the term of this Agreement, Sub-Licensee, its affiliates, officers, directors, principals, shareholders, employees, representatives, and agents shall not engage, directly or indirectly, as owner, shareholder, affiliate, partner investor, director, of officer in the development, manufacture, processing, distribution, or sale of any product that competes with the Products which are the subject of this Agreement, or any amendment thereto without the Sub-Licensor's written consent.

    5.8 Territory Sales. Sub-Licensor and Sub-Licensee agree that each will not sell any Product to any person or entity which is in the Territory of the Sub-Licensee or in the Other Exclusive Territory of another sub-licensee or BFI, respectively, In case some customer of the Sub-Licensee buys Products in the Sub-Licensee's Territory, but it sells outside of Sub-Licensee's Territory and this action affects any Other Exclusive Territory of another sub-licensee or BFI, this event will be evaluated and defined by the Sub-Licensor with notification given to Sub-Licensee. Sub-Licensor and Sub-Licensee agree to work together to resolve any issues that arise from such a situation. This clause protects also the interests of the Sub-Licensee from other sub-licensees and BFI. Sub-Licensor agrees to provide Sub-Licensee with a First Option to increase its territory, once Sub-Licensee is getting its goals in its territory and demonstrates to Sub-Licensor the new territory can be attended by him and it is a good potential territory.

    5.9    Compliance with Law. Sub-Licensee will be responsible for compliance with governmental laws and regulations in any way applicable to the manufacture, packaging, marketing, distribution and sale of all UF Products, including without limitation the laws and regulations of the FDA, USDA, or any other existing federal agency, in its territory. Sub-Licensee will notify the Sub-Licensor of any violations of or changes to existing rules as it becomes aware of them and work with Sub-Licensor to

11

make any necessary changes in time and form to avoid paying any charge or penalty to the Authorities.

6. Duties of the Sub-Licensor - Sales & Marketing

6.1 Review of Sales Results. Sub-Licensor will participate in a regularly scheduled discussion with Sub-Licensee, initially, at a minimum, on a monthly basis to review the Monthly Sales Reports and suggest ways to improve the sales of the Products.

6.2 Marketing. Sub-Licensor will work with Sub-Licensee to develop a marketing strategy that will be presented to the Sub-Licensor for its approval to ensure that the Brand and its image are properly protected. The Sub-Licensor shall also participate with Sub-Licensee in regularly scheduled discussions, initially at a minimum on a monthly basis, to review and suggest ways to improve the sales of the Products within the Territory.

6.3 UF Marketing Expenses. Sub-Licensor may agree, but is not obligate to incur marketing expenses ("UF Marketing Expenses") for specific sales campaigns ("UF Sales Campaigns") and to provide Sub-Licensee's Customers and retail outlets with promotional corporate materials to accomplish an agreed upon UF Sales Campaign. Such expenses shall be compensated by Sub-Licensor granting a specific percentage discount for all sales of the Product(s) being promoted during the time frame approved or such other method of compensation as agreed to by the Sub-Licensor. The approval for such marketing expenses shall be given in writing and shall be signed by a Sub-Licensor's representative. In the event such promotion is approved, Sub-Licensee shall be authorized to take a deduction, in the same amount, from any amounts that are due for the month in which the promotion occurred.

7. Other Products - Additional UF Products and Third Party Products

7.1 Additional UF Products. Sub-Licensor may, at its discretion, propose to Sub-Licensee, from time to time, additional UF Products, not included as Products licensed hereunder, or UF Products licensed hereunder but manufactured by UF in México or by US Manufacturers not managed by Sub-Licensee, for sale by Sub-Licensee in the Territory ("Additional UF Products"). Sub-Licensor will offer additional UF Products to Sub-Licensee at a price no higher than the lowest price such product is offered to another Sub-Licensee or BFI, FOB Houston or Manufacturers Plants.

7.2 Acceptance of Additional UF Products. Sub-Licensee will discuss with the Sub-Licensor the possible exploitation of additional UF Product opportunities to the extent they are viable. Nothing in this Agreement creates an obligation by Sub-Licensor



12

to award to Sub-Licensee any rights for Additional UF Product or for Sub-Licensee to agree to distribute any Additional UF Products.

7.3     Agreement Will Apply To Additional UF Products. In the event Sub-Licensor and Sub-Licensee should agree for Sub-Licensee's distribution of an Additional UF Product, the Parties agree that the provisions of this Agreement, including the royalty provisions of Section 9, would apply to the Additional UF Product unless otherwise agreed to by the Parties.

7.4     Manufacture of Additional UF Products.  Should Sub-Licensor agree to award to Sub-Licensee the right to contract with US Manufacturers for the manufacture of an Additional UF Product, Sub-Licensor would provide the necessary specifications and any other information and support necessary to facilitate the manufacture of such Additional UF Product.

7.5     Sale of Third Party Products.   Sub-Licensee may, from time to time, identify opportunities to sell the products of other third parties alongside the distribution UF Products ("Third Party Products").   To insure that the Third Party Products do not compete with the UF Products as set forth in paragraph 5.7 above, if the Sub-Licensee believes that a Third Party Product has the potential to compete with a UF Product, Sub-Licensee shall give Sub-Licensor notice of its intent to sell such Third Party Products. Sub-Licensor shall promptly notify Sub-Licensee if it believes that the new Third Party Product violates paragraph 5.7 above.  In the event such notice is given, the Parties agree to meet in good faith to resolve the issue.  No royalties are due on Third Party Products.

7.6     Agreement Will Apply To Additional UF Products, even Third Parties Products under PL Brands. In the event Sub- Licensor and Sub-Licensee should agree for Sub-Licensee to market and sell a Third Party Product as a PDL Brand, the Parties agree that the provisions of this Agreement, including the royalty provisions of Section 9, would apply to the additional Third Party Product.

8.     Other Products - Other Brand Owners

8.1     Other Brand Owner's Products.  Sub-Licensee may, from time to time, identify opportunities to sell the products of other third parties under a UF trade name or Brand name ("Rebranded OBO Products").   Sub-Licensee may propose to Sub-Licensor that it be allowed to sell these Rebranded OBO Products.  Sub-Licensor's agreement in writing, at Sub-Licensor's absolute discretion, is required in order for the Sub-Licensee to rebrand, market, distribute and sell any Rebranded OBO Products.   Sub-Licensor's agreement with Sub-Licensee to sell Rebranded OBO Products shall be set forth in an amendment to this Sub-License Agreement in form and substance satisfactory to Sub-Licensor and Sub-Licensee.  The holders of any rights to the manufacture, marketing

13

distribution and sale of the Rebranded OBO Products must enter into agreements allowing the manufacture, marketing, distribution and sale of the Rebranded OBO Products to assure that the manufacture, rebranding, marketing, distribution and sale of the Rebranded OBO Products does not conflict with the rights of any other parties ("the OBO Products Agreements"). The OBO Products Agreements must be in form and substance satisfactory to Sub-Licensor's and Sub-Licensee's legal counsel. Nothing in this Agreement shall be construed as approval by Sub-Licensor to enable Sub-Licensee to manufacture, market, distribute and sell Rebranded OBO Products without the express written permission of Sub-Licensor.

8.2    Rebranded OBO Products Indemnity. Should Sub-Licensor agree to Sub-Licensee's manufacturing, marketing, distribution and sale of Rebranded OBO Products, Sub-Licensee hereby agrees to defend, indemnify and hold harmless Sub-Licensor, PDL, their affiliates and their former and current directors, officers, administrators, shareholders, employees, attorneys, agents, representatives, successors and assigns ("the indemnified parties") , from and against any claims, losses, harm, liabilities, costs and expenses including court costs and reasonable attorneys' fees, arising from Sub-Licensee's negligence or breach of this Agreement, or arising from any claim or law suit against the indemnified parties, derived from the manufacturing, marketing, distribution or sale of Rebranded OBO Products.

9.    Royalties

9.1    Royalties Payments. In consideration of Sub-Licensor's award to Sub-Licensee of the rights awarded under this Agreement, and subject to the terms of this Agreement, Sub-Licensee will pay a royalty to Sub-Licensor or its designee, as follows:

9.1.1 UF Royalty Percentage. For UF Products or Rebranded OBO Products manufactured by US Manufacturers, Sub-Licensee will pay to Sub-Licensor a five percent (5%) Royalty ("UF Royalty Percentage"), unless otherwise agreed to by the parties, on the Net Sales amount billed monthly by Sub-Licensee, less taxes, shipping and applicable credits or discounts Sub-Licensee offers or credits and discounts approved by Sub-Licensor, and awarded by Sub-Licensee (Net Sales) for all UF Products and Rebranded OBO Products, ("UF Qualified Sales") for sale of each such UF or Rebranded OBO Product sold excluding products sold under the "Bonafina" name and other UF Products imported from Mexico or sold by BFI as finished product ("Non-Royalty Products") as provided in section 9.3 below ("UF Qualified Product").

9.1.2 Royalty Payment Calculation. The total aggregate royalty ("Royalty Payment") will be paid monthly and will be equal to the sum calculated by multiplying

14

the applicable UF Royalty Percentage times the total of the UF Qualified Sales for each UF Qualified Product.

9.1.3 Royalty Payment Accounting Period.   The Royalty Payment will be calculated and paid on or before the Thirtieth (30th) day of each month for sales occurring during the prior month. For example, royalties due for sales made during the month of February would be due and payable on or before the 30th day of March, and so on throughout the year ("the Royalty Payment Accounting Period").

9.1.4 Royalty Payments.  Royalty Payments will be paid by wire transfer to Sub-Licensor's bank account. Wiring instructions for the bank account will be provided by Sub-Licensor to Sub-Licensee.  On the same day of the wire transfer, Sub-Licensee will provide notice to Sub-Licensor by email or fax of the payment and amount thereof.

9.1.5 Royalty Reports. At the time the royalty payment is made, Sub-Licensee shall provide by overnight mail a summary report showing the amount of the royalty payment being made and how it was calculated.  In addition, the report shall show for each Product, the actual sales for the month, the projected sales for the month, and the cumulative total for the year. The actual form of the report shall be agreed to by the Parties.  In addition to the royalty report, Sub-Licensee shall provide copies of all invoices for sales made during the Royalty Payment Accounting Period when Sub-Licensor asks him for it.

9.1.6 Past Due Royalty Payments.  In order to assist Sub-Licensee develop the business, Sub-Licensor has allowed Sub-Licensee to forego paying the royalties which have become due from the sale of the licensed Product. Terms relating to the payment of these past due Royalties will be documented in a separate letter outside of this Agreement relating to this subject.  In the event any payment has not been made or is not made when due, the whole amount shall bear interest at the rate of six percent (6%) per annum.

9.1.7 Sub-Licensor Loan to Sub-Licensee.  In order to assist Sub-Licensee develop the business, Sub-Licensor has made loans to Sub-Licensee.  Terms relating to the repayment of these loans will be documented in a separate letter outside of this Agreement relating to this subject.  In the event any payment has not been made or is not made when due, the whole amount shall bear interest at the rate of six percent (6%) per annum.

9.2    Royalty Payment Audit. Sub-Licensee shall permit Sub-Licensor to audit its books and records relating to the Royalty Payments up to 4 times per year between the 10th and 20th of any month on 15 days notice.  In the event that the audit shows an error of four percent (4%) or more, Sub-Licensor may require Sub-Licensee shall pay for the cost of the audit and shall make such payment with the next monthly royalty payment following the month of the audit.

15

9.3    Non-Royalty Products.  Sub-Licensee currently purchases Product under the mark "Bonafina" and other Non-Royalty Products from Sub-Licensor and/or BFI. The Parties acknowledge that Sub-Licensee does not owe any royalties under this Section 9 for Bonafina products and other Non-Royalty Products. Sub-Licensee purchases Bonafina concentrate ("Bonafina Concentrate") from Sub-Licensor from which it has and will manufacture orange drink and other flavored fruit drinks which it sells under the Bonafina trade name.  The purchase price charged by UF for the Bonafina Concentrate includes its Royalty and therefore no additional Royalty is applicable.  The Bonafina concentrate price charged by Sub-Licensor, or its agent, to Sub-Licensee shall not be higher than the lowest price charged to any other purchaser of Bonafina Concentrate, not including the cost of transportation beyond the FOB point.

10.    Term of the Agreement

10.1    Effective Date of this Agreement.   This Sub-License Agreement shall be effective as of the date first written above. The Sub-License Agreement shall remain in full force and effect, unless: (i) The rights under this Sub-License Agreement are purchased by the Sub-Licensor as provided for in Section 11; (ii) the rights under this Sub-License Agreement are sold by the Sub-Licensee to a 3rd party as provided for in section 12 or (iii) the agreement is terminated ("Termination") as provided for in Section 13.

10.2    Supply of Products and Raw Materials.  The Sub-Licensor acknowledges that the Sub-Licensee depends on the continuing supply of Products and certain raw materials such as concentrates for it to run its business and pledges not to interrupt that supply of Products and certain raw materials during the term of this Agreement.

11.    Purchase

11.1    The Sub-Licensor hereby reserves the right to buy out Sub-Licensee's rights in this Sub-License Agreement. ("UF Product Business") if the Sub-Licensee cannot continue or does not want to continue to manage the business and the Sub-Licensee agrees.



11.2    Notice of Interest to Purchase.  If the Sub-Licensor, or its designated assignee, after discussions with the Sub-Licensee, determines that the Sub-Licensee would be interested in considering a potential purchase of the UF Product Business by the Sub-Licensor ("Purchase"), the Sub-Licensor would provide notice of its interest in a Purchase to the Sub-Licensee ("Notice").

16

11.3   Determination of Purchase Price. The purchase price ("Purchase Price") to be paid by Sub-Licensor to Sub-Licensee, should Sub-Licensor provide Notice of its desire to pursue a Purchase,, shall be equal to an amount to be agreed to by Parties within One Hundred Twenty Days (120) from the date of the Notice ("Pricing Period)". If the Parties fail to agree on a Purchase Price within the Pricing Period, then, if the Parties continue to be interested in a Purchase, they may jointly select a business appraiser to establish the fair value of the UF Product Business ("Fair Value Price"). Alternatively, each Party may select a business appraiser with 3rd being selected by the two appraisers to determine the Fair Value Purchase Price. In this case the Purchase Price will be set at the average of the Fair Value defined by each appraiser, defined by each appraiser. The Parties will share the costs of the appraisers equally.

11.3.1   Other Qualified Buyer. During the Pricing Period and up to the Closing, the Sub-Licensee may solicit Qualified Buyers as provided for in Section 12. In the event that Sub-Licensee locates a Qualified Buyer that it wants to seriously consider, the Sub-Licensor shall have the right of the first refusal for thirty (30) days to decide if it wants to offer a purchase price and terms that meet or exceed the purchase price and/or terms offered by the Quality Buyer. If the Sub-Licensor decides that it does not want to meet or exceed the price and terms offered by this Qualified Buyer, it will simultaneously provide its acceptance or rejection of the Other Qualified Buyer as provided for in Section 20 of this Agreement.

11.3.2 Suspension of the Purchase.   If the Sub-Licensee determines in its sole discretion that neither the Purchase Price offered by the Sub-Licensor nor the Fair Value Price nor any price offered by an Other Qualified Buyer, meets the Sub-Licensee's own assessment of the value of the UF Business to itself, it may suspend any further consideration of the Purchase.   The Sub-Licensor will have the right to consider the Purchase at some future point if the Sub-Licensee agrees to restart the process at that point.

11.4.   Completing the Purchase.   Within thirty (30) days of determination of the Purchase Price, acceptable to both the Sub-Licensee and Sub-Licensor, the Sub-Licensor shall have the right to notice its exercise of the right to purchase Sub-Licensee's UF Product Business.   The Purchase will take place on or before selected by the Parties ("Closing").   The terms for the Purchase shall be as follows unless otherwise agreed to by the Parties:   The Purchase Price plus an amount equal to the value of all accounts receivable, raw material and finished goods inventories or other assets of the Sub-Licensee being acquired by the Sub Licensor shall be paid on Closing. The documents for the Purchase shall contain appropriate due diligence clauses, contingencies, representations and clauses to assure Sub-Licensor that the assets purchased are free from any third party claims, that the financial statements are accurate and that all appropriate taxes and other governmental obligations have been complied with (collectively "Due

17

Diligence Documents"). The sale documents shall be satisfactory to Sub-Licensor and Sub-Licensor's legal counsel.

11.5 Continued Operations. In the event that Sub-Licensor should decide to Purchase the UF Products Business, until the Closing has been finalized, the Parties agree to operate under the existing terms of the Agreement and shall not interfere with either Party's ability to successfully operate the Sub-Licensee's UF Product Business.

11.6 Each of the Parties shall be responsible for their own costs and expenses relating to the Purchase.

12. Sale

12.1 If the Sub-Licensee decides to sell the UF Product Business it has created, Sub-Licensor has the First Option to purchase the business at a price agreed to by the Parties. The payment of the Purchase Price shall be made at the Closing or in such other manner as agreed to by the Parties. If the Sub-Licensor does not elect to purchase the UF Product Business, the Sub-Licensee may solicit offers to purchase the business from third parties. If the Sub-Licensee secures what it considers to be reasonable offer from a qualified buyer ("Qualified Buyer") for Sub-Licensee's UF Product Business, the Sub-Licensor will have the right to approve such Qualified Buyer on a timely basis consistent with the terms of Section 20.

13. Termination.

13.1 This Agreement may be but not necessarily must be terminated upon the following grounds:

13.1.1 Upon the mutual written agreement of the Parties.

13.1.2 By the non-breaching Party if after notice is given, the breaching Party fails to cure a material breach ("Material Breach") and the Sub-Licensor reasonably determines such Material Breach is injurious to Sub-Licensor's business, reputation, goodwill, or the Brands. Material Breaches shall include, without limitation, the following:

1. Sub-Licensee's failure to pay any amount due under this Agreement within thirty (30) days of receipt of notice of delinquency for any

18

obligations incurred after the date that this Agreement is signed by both parties as indicated in the signature blocks following Section 34.

2.  Sub-Licensee's failure to cure its failure to use commercially reasonable efforts to comply with the Quality Controls and Product Specifications or US Manufacturer's agreements within thirty (30) days of receipt of notice of such deficiency for those Products for which the Quality Controls and Product Specifications have been received on a timely basis.

3.  Sub-Licensee's misuse of the Brand Owner's Brands.

4.  Sub-Licensee's misuse of Sub-Licensor's Confidential Information or Intellectual Property.

5.  Sub-Licensee's failure to meet Seventy Percent (70%) of the total Annual Product Sales Goal for all UF Products for the preceding year, two years in a row, after allowing for Annual Product Sales Goal Assumptions that were not realized.

6.  If Sub-Licensee's proceeds for any of the segregated portions of the Territory should drop below Seventy Percent (70%) from the year prior to the preceding calendar year two years in a row, after allowing for Annual Product Sales Goal Assumptions that were not realized, Sub-Licensor may, at its absolute discretion, revoke the License for that particular segregated portion of the Territory where sales have dropped ("the revoked portion of the Territory"), upon Ninety (90) Days written notice to Sub-Licensee. Upon revocation, Sub-Licensor would be free to exploit directly or to award the revoked portion of the Territory to any third party of its choice.



7.  Failure to cure any notice of any local, state or federal agency issued with regard to the manufacturing or storage of the UF Products.

8.  Paragraph purposely omitted.

9.  Sub-Licensee engages in any deceptive, unethical, or illegal business practice, promotion, or advertising.

10. Sub-Licensee's failure to cure a breach of a US Manufacturer's Agreement shall within thirty (30) days of receipt of notice of such deficiency.

19

11. The breaching Party, or any of its officers, directors, or substantial shareholders being convicted or entering a plea of nolo contendere to any offense that involves fraud or dishonesty or is punishable by a term of imprisonment ("Offense") shall constitute a breach to the extent that such Offense impacts the Brands or the image of the Products.

12. The breaching Party becoming insolvent, unable to pay its debts as they become due, cannot operate the business or can't supply product or ingredients, making any assignment for the benefit of its creditors, or having any substantial part of its assets placed in receivership liquidation, or bankruptcy (voluntary or involuntary). In the event that the breaching Party in this sub-paragraph is the Sub-Licensor or the Brand Owner, the Sub-Licensee will immediately be granted an unencumbered right to use the Brands and any Confidential Information or any other information it may have of the Sub-Licensor or the Brand Owner in perpetuity thereby permitting the Sub-Licensee to continue in business and at the same time protect the future interests of the Sub-Licensor to the Brands.

13.2 Notice of Termination. Other than as may be agreed in writing by the Parties, Thirty (30) days written notice of termination ("Notice Date"), shall be given by the non-breaching Party, provided that the Party in breach shall have the right (except when termination is for Cause or the breach is irremediable") to cure such Material Breach during the notice period.

13.3 Issue Resolution. To the extent that there is a dispute between the Parties regarding the grounds for declaring a Material Breach or determining whether a Material Breach has been cured ("Dispute"), such Dispute, if not resolved by the Parties, shall be resolved under the provisions of Paragraph 25.

13.3.1 During the period from the Notice Date to the end of the period during which a Dispute, if any, is being resolved, the Parties agree to operate the UF Product Business on a continuing basis as they were before the Dispute occurred to protect the Brands.

13.4: Compensation to Sub-Licensee. If this Agreement is terminated by the Sub-Licensor, the Sub-Licensee shall be entitled to 70% of the Fair Value Price as determined in Paragraph 11.3 or such other Purchase Price as the Parties may agree upon ("Compensation"). This Compensation shall be

20



paid by the Sub-Licensor to the Sub-Licensee in equal monthly installments over the period of twenty-four (24) months.

13.5 Existing Inventory. Upon Termination, Sub-Licensee may distribute or sell all Products in its possession, for a period of Sixty (60) days, so long as the Product conforms with all applicable laws and regulations. Any Product on hand after said Sixty (60) day period must be destroyed by Sub-Licensee.

14. Confidential Information.

14.1 Confidential Information. As used in this Agreement, Confidential Information means information disclosed by Sub-Licensor to Sub-Licensee or Sub-Licensee's employees, and/or agents or Confidential Information disclosed by Sub-licensee to Sub-Licensor or Sub-Licensor's employees, and/or agents during the term of this Agreement. Confidential Information is to be broadly defined and includes: (i) this Agreement; (ii) all information that has or could have commercial value or other utility in the business in which Sub-Licensor or Sub-Licensee is engaged or in which either contemplates engaging; and, (iii) all information that, if disclosed without authorization, could be detrimental to Sub-Licensor or Sub-Licensee, whether or not such information is identified as Confidential Information by Sub-Licensor or Sub-Licensee ("Confidential Information"). By example and without limitation, Confidential Information includes all information concerning formulation of Products, the Product manufacturing processes, quality control specifications, marketing plans, business plans, strategies, forecasts, unpublished financial information, budgets, and customer identities, and agreements as well as any other information explicitly labeled as confidential.

14.2 Paragraph purposely omitted.

14.3 Protection of Sub-Licensor and Sub-Licensee Confidential Information. Sub-Licensee and Sub-Licensor will hold in trust, keep confidential and not disclose or reveal to any third party any Confidential Information of the other Party except on a "need to know" basis and without first indicating to that third party that we consider this to be Confidential Information and would ask that they protect our Confidential Information in the same manner as they protect their own confidential information.

14.4 Transfer of Information to Sub-Licensee and Sub-Licensor. Prior to dissemination of Confidential Information to Sub-Licensee or Sub-Licensor, by Sub-Licensor or Sub-Licensee, the receiving parties officers and employees and consultants who will have access to such Confidential Information, shall first be informed that there is a Confidentiality Agreement signed by the Sub-Licensee and Sub-Licensor, substantially in the form of the Non-Disclosure Agreement attached hereto as Exhibit 14.4 and that such Confidential Information is to be held in strict confidence, and said



21

persons are required to keep said information confidential and that the failure of any person to keep Confidential Information confidential can be a grounds for termination of employment.

14.5    Transfer of Information to US Manufacturers.   Prior to Sub-Licensee or Sub-Licensor disseminating any Confidential Information to any US Manufacturer or potential US Manufacturer, their officers, employees and/or consultants, who will have access to the Confidential Information, Sub-Licensee or Sub-Licensor, as the case may be, is required to attempt to have that Party sign a Non-Disclosure Agreement substantially in the form of the Non-Disclosure Agreement attached hereto as Exhibit 14.4. In the event that the Party is unwilling to sign such an agreement, the Sub-Licensor shall be so advised and decide how to proceed. At a minimum, the Party is to be advised that we consider this to be Confidential Information and would ask that they protect our Confidential Information in the same manner as they protect their own confidential information.

14.6    Injunctive Relief.   Sub-Licensee and Sub-Licensor acknowledge that the disclosure of any of Confidential Information to any unauthorized third party may cause irreparable injury to the Sub-Licensor or Sub-Licensee and that money damages may not be adequate to protect Sub-Licensor or Sub-Licensee. Accordingly in the event of Sub-Licensee's or Sub-Licensor's breaches any of the non-disclosure or confidentiality terms of this Agreement, Sub-Licensor or Sub-Licensee shall be entitled to the issuance of an injunction necessary to protect Sub-Licensor's or Sub-Licensee's interests.

14.7    Return of information.   Upon termination of this Agreement, Sub-Licensee and Sub-Licensor shall return all Confidential Information (original and copies) in its possession and control to Sub-Licensor and Sub-Licensee, as the case may be.

14.8 Compensation for Disclosure. In the event that the Sub-Licensor or Sub-Licensee discloses any Confidential Information of the other Party ("The Disclosed Party"), the Parties acknowledge that the Disclosed Party is entitled to monetary damages (i) as agreed to by the Parties: (ii) or as may be awarded subject to Section 25.

15.    Notices.   All notices permitted or required hereunder, shall be sent by courier (next day delivery) to the addressee at the addresses listed and, concurrently therewith, by fax or email to the numbers set forth below, or to such other addresses, email addresses and fax numbers as the parties may direct:

Incredible Foods Group, LLC:
400 Main Street, Suite 408
Attn: Julia Magallanes
Stamford, CT 06901
Fax:   631-392-0542

22

Tel :   203-353-9356
E-Mail: jmagallanes@ifgrp.com

UNIFOODS or Productos de Leche
Poniente 122 # 459
Attn: Javier Perez Grovas
Col. Industrial Vallejo Mexico D.F
C.P. 02300
Fax:   011-52-461-5987600 Ext. 2336
Tel:   011-52-461-5987607
E-Mail: jpgrovas@yahoo.com

With a copy of any legal notices to:

Daniel L. Guevara, Esq.
Guevara, Phippard & James PC
1420 Kettner Boulevard, Suite 600
San Diego, CA 92131
Tel:   (619) 531-0123
Fax:   (519) 544-0056
E-Mail: dguevara@gpjsdlaw.com

16.    Currency.  All monetary amounts referred to in this Agreement are in United States (US) dollars.

17.    Entire Agreement / Modifications.  This Agreement, exhibits hereto, as well as agreements and other documents referred to in this Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter hereof and thereof.  This Agreement supersedes any prior agreements or understandings with respect thereto. There are no agreements, representations, or warranties between or among the Parties other than those set forth in this Agreement or the documents and agreements referred to in this Agreement. This Agreement may not be altered or modified except in writing, signed by the Parties.

18.    Counterparts.  This Agreement may be executed in counterparts, and all such counterparts, taken together, shall constitute one original. The Parties authorize each other to detach and combine original signature pages and consolidate them into a single identical document.  Anyone of such completely executed counterparts shall be sufficient proof of this Agreement.

19.    Governing Law/Jurisdiction.   This Agreement shall be governed by and construed under the laws of  the state of New York, and the Parties hereby agree to



23

jurisdiction of the US District Court and venue at the Eastern District of New York, 225 Cadman Plaza E., Brooklyn, New York, 11201.

20. **Assignment.** Sub-Licensee may not voluntarily or by operation of law assign, sell, give, transfer, sublicense, or otherwise transfer or encumber all of any part of its rights, duties, or other interests in this Agreement or the proceeds thereof (collectively, Assignment), without Sub-Licensor's prior written consent, which consent shall be at Sub-Licensor's absolute discretion but which shall not be unreasonably withheld based on the qualifications of the proposed assignee. Any attempt by Sub-Licensee to make an Assignment in violation of this provision shall be a material default under this Agreement and Assignment in violation of this provision shall be null and void. In the event Sub-Licensee desires to sell its rights under this Agreement to its UF Product business, IFG hereby grants to UF a right of first refusal to purchase the business on the same terms and conditions. No provisions of this Paragraph or this Agreement shall limit the ability of the Sub-Licensee to raise equity by selling a minority interest in the Sub-Licensee's UF Products Business as long as the current owners of IFG retain a majority interest in the business and the Sub-Licensor has had the opportunity review and approve the acquirer of such minority interest, such approval not being unreasonably withheld.

21. **Binding on Successors and Assigns:** Each and all of the provisions hereof shall be binding on and inure to the benefit of the Parties hereto and their respective heirs, executors, administrators, successors and assigns.

22. **Counting of Days.** If a party is required to complete the performance of an obligation under this Agreement by a date certain and such date is a Saturday, Sunday, or US federal bank holiday (collectively, a Nonbusiness Day), then the date for the completion of such performance will be the next succeeding day that is not a Nonbusiness Day.

23. **Waiver.** No delay, default or failure of either party in exercising any right, power, or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, or remedy preclude other or future exercise thereof or the exercise of any other right, power, or remedy.

24. **Severability.** If any term or provision of this Agreement is determined to be illegal, unenforceable, or invalid in whole or in part for any reason, such illegal, unenforceable, or invalid provisions or part thereof shall be stricken from this Agreement, and such provision shall not affect the legality, enforceability, or validity of the remainder of this Agreement. If any provision or part thereof of this Agreement is stricken in accordance with the provisions of this section, then this stricken provision shall be replaced, to the extent possible, with a legal, enforceable, and valid provision that is as similar in tenor to the stricken provision as is legally possible.

24

25. Arbitration. The parties shall submit any dispute concerning the interpretation of or the enforcement of rights and duties under this Agreement to final and binding arbitration pursuant to the Commercial Rules of the American Arbitration Association in New York City and administered by the American Arbitration Association. The arbitrator(s) however is not given the authority to make a mistake of law in conducting the arbitration hearing. Arbitration shall be conducted by a single, neutral arbitrator, or, at the election of any party, three neutral arbitrators, appointed in accordance with the Commercial Rules of the American Arbitration Association. The award of the arbitrator(s) shall be enforceable according to the applicable provisions of law. The arbitrator(s) may award damages and/or permanent injunctive relief. Notwithstanding the foregoing, a party may apply to a court of competent jurisdiction for relief in the form of a temporary restraining order or preliminary injunction, or other provisional remedy pending final determination of a claim through arbitration in accordance with this paragraph. If proper notice of any hearing has been given, the arbitrator(s) will have full power to proceed to take evidence or to perform any other acts necessary to arbitrate the matter in the absence of any party who fails to appear.

26. General Interpretations. The terms of this Agreement have been negotiated by the Parties hereto and the language used in this Agreement shall be deemed to be the language chosen by the Parties hereto to express their mutual intent. This Agreement shall be construed without regard to any presumption or rule requiring construction against the party causing such instrument or any portion thereof to be drafted, or in favor of the party receiving a particular benefit under the Agreement. No rule of strict construction will be applied against any person.

27. Headings and Labels. Paragraph, article, section, and subsection titles and captions contained in this Agreement are inserted as a matter of convenience and for reference and in no way define, limit, extend, or describe the scope of this Agreement or the intent of any of its provision.

28. Recitals. The recitals set forth at the beginning of this Agreement of any matters or facts shall be conclusive proof of the truthfulness thereof and the terms and conditions set forth in the recitals, if any, shall be deemed a part of the Agreement.

29. Time of the Essence. Time is of the essence in respect to all provisions of this Agreement in which a definite time for performance is specified; provided, however, that the foregoing shall not be construed to limit or deprive a party of the benefits of any grace or use period provided for in this Agreement.

30. Further Assurances. The parties shall at their own cost and expense execute and deliver such further documents and instruments and shall take such other actions as may be reasonably required or appropriate to carry out the intent and purposes of this Agreement.

25

31. Execution of Agreement. This Agreement was executed voluntarily without any duress or undue influence on the part of or on behalf of the parties hereto. The parties acknowledge that they have read and understood this Agreement and its legal effect. Each party acknowledges that it has had a reasonable opportunity to obtain independent legal counsel for advice and representation in connection with this Agreement.

32. Attorney's Fees. If either party to this Agreement shall bring any action, suit, counterclaim, appeal, or arbitration for any relief against the other, declaratory or otherwise, to enforce the terms hereof or to declare rights hereunder (collectively, an Action), the losing party shall pay to the prevailing party a reasonable sum for attorneys' fees and costs incurred in bringing and prosecuting such Action and/or enforcing any judgment, order, ruling, or award (collectively, a Decision) granted therein, all of which shall be deemed to have accrued on the commencement of such Action and shall be paid whether or not such Action is prosecuted to a Decision. Any Decision entered in such Action shall contain a specific provision providing for the recovery of attorneys' fees and costs incurred in enforcing such Decision. The court or arbitrator may fix the amount of reasonable attorneys' fees and costs on the request of either party. For the purposes of this paragraph, attorneys' fees shall include, without limitation, fees incurred in the following: post-judgment motions and collection actions; contempt proceedings; garnishment, levy, and debtor and third party examinations; discovery; and bankruptcy litigation. "Prevailing party" within the meaning of this paragraph includes, without limitation, a party who agrees to dismiss an Action on the other party's payment of the sums allegedly due or performance of the covenants allegedly breached, or who obtains substantially the relief sought by it.

33. Sub-Licensor Rights: The Parties acknowledge that Sub-Licensor and its Brands, that represent its patrimony, or the Sub-Licensee may be irreparably harmed by any failure or omission of Sub-Licensee or Sub-Licensor to strictly follow the provisions of this Agreement, and agree that Sub-Licensor or Sub-Licensee may, in the event of such failure or omission on the part of Sub-Licensee or Sub-Licensor and in addition to any and all other remedies Sub-Licensor may have at law, in equity or under this Agreement, obtain any injunctive or equitable relief available under the laws of the applicable TERRITORY.



34. Cumulation of Remedies: No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

26

Executed as of the date first written above.

Incredible Foods Group, LLC

By: _____

Calvin E. Cordulack

Title:   PARTNER

Date: _____


By: _____

Julia E Magallanes

PARTNER

Date: _____


UNIFOODS

By: _____

Manuel Del Toro Moreno

Title: GENERAL DIRECTOR

Date: _____


By: _____

Javier Perezgrovas Robles Gil

International TRADE DIRECTOR

Date: _____

27

**EXHIBIT 1.2**

Pursuant to the license agreement between Productos de Leche, S.A. de C.V., a Mexican corporation and Unifoods S.A. de C.V., a Mexican corporation, Unifoods has the right to sell and distribute the following brands within the United States:

CHIPILO: Dairy Products, Creams, Cheeses, Butter and Yogurt in various forms.

BONAFINA: Orange Drink and Multiple Flavors of other Fruit drinks and Punch.

BONACULT: Fermented Dairy Drink

28



**EXHIBIT 2.3**

**TERRITORY**

The State of New York
The State of New Jersey
The State of Connecticut
Eastern Pennsylvania
The State of Delaware
Metropolitan area: City of Chicago, IL.

**OTHER EXCLUSIVE TERRITORIES**

Texas by Bonafina Inc

California State by Bonafina Inc



29

**EXHIBIT 3.1**

The Quality Controls and Product Specifications are part of the Unifoods
Confidential Information and shall be delivered in a separate envelope marked
"Confidential" prior to the execution of this Agreement.



30

**EXHIBIT 3.2**

APPROVED US MANUFACTURERS

1.    Evans Family Farmhouse, Norwich, NY -- INACTIVE

2.    Country Pure Foods, Ellington, CT  -Managed by IFG

3.    Merrytime Foods, Marshall, TX  -Managed by UF & BFI

4.    Farmers' Select Dairy, El Paso, TX   -Managed by UF & BFI

5.    BGC Manufacturing, Tyler, TX   -Managed by UF & BFI

6.    Imperial Sausage Co. San Antonio,  TX   -Managed by UF & BFI

7.    Diamond Drinks, Williamsport, PA  -Managed by IFG, Manufacturer's
        Agreement signed.

31



## EXHIBIT 5.5

Annual Product Sales Goals – 2011 and Annual Product Sales Goal Assumptions – 2011

SEE ACCOMPANYING EXCEL FILE NAMED:

EXHIBIT 5-5 Annual Product Sales Goals & Assumptions – 2011 20110405.xlsx

32



**EXHIBIT 14.4**

**NON-DISCLOSURE AGREEMENT**

THIS NON-DISCLOSURE AGREEMENT (this "Agreement") is made and entered into as of _____ between _____
having its principal place of business at _____

_____
("Company") and _____,
having its principal place of business at _____
_____, USA.

Purpose: Company and _____ wish to explore a business opportunity of mutual interest and in connection with this opportunity wish to execute this Agreement to document the fact that will protect the other's confidential information.

1.  Confidential Information: Confidential information means any information disclosed to by one party to the other, either directly or indirectly in writing, orally or by inspection of tangible or intangible objects, including without limitation, process, pricing, recipes, documents, business plans, financial analysis, marketing plans, customer names, customer lists, and customer data. Confidential Information may also include information disclosed about a third party's or the property of that third Party. Confidential Information shall not, however, include any information which the Receiving party can establish (i) was publicly known and made generally available in the public domain prior to the time of disclosure; (ii) becomes publicly known and made generally available after disclosure through no action or inaction of Receiving Party; or (iii) is in the possession of Receiving Party, without confidentiality restrictions, at the time of disclosure by the Disclosing Party as shown by Receiving Party's files and records immediately prior to the time of disclosure. The party disclosing the Confidential Information shall be referred to as "Disclosing Party" in the Agreement and the party receiving the Confidential Information shall be referred to as "Receiving Party" in the Agreement.

2.  Non-use and Non-disclosure: The Receiving Party agrees not to use any Confidential Information for any purpose except to evaluate and engage in discussions concerning a potential business relationship between the parties hereto. Receiving Party agrees not to disclose any Confidential Information to third parties or to its employees, except to those employees who are required to have the information in order to evaluate or engage in discussions concerning the



33

contemplated business relationship. The Receiving Party shall not reverse engineer, disassemble or decompile any prototypes or other tangible objects which embody the Disclosing Party's Confidential Information and which are provided to the Receiving Party hereunder.

3. Maintenance of Confidentiality Information: The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own most highly confidential information and shall have its employees, if any, who have access to Confidential Information sign a non-use and non-disclosure agreement in content substantially similar to the provisions hereof, to the extent that they normally have such employees sign such agreements in relation to their own confidential information, prior to any disclosure of Confidential Information to such employees. The Receiving Party shall not make any copies of Confidential Information unless the same are previously approved in writing by the Disclosing Party. The Receiving Party shall reproduce the Disclosing Party's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original. The Receiving Party shall immediately notify the Disclosing Party in the event of any unauthorized use or disclosure of the Confidential Information.

4. No Obligation: Nothing herein shall obligate either party to proceed with any transaction between them, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the business opportunity. In the event that the Parties decide to proceed with the contemplated transaction, this Agreement shall live on and remain in place for the duration of the relationship of the parties.

5. No Warranty: ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS". NEITHER PARTY MAKES ANY WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING ITS ACCURACY, COMPLETENESS OR PERFORMANCE.

6. Return of Materials: All documents and other tangible objects containing or representing Confidential Information and all copies thereof which are in the possession of Receiving Party shall be and remain the property of the Disclosing Party and shall be promptly returned to the Disclosing Party upon the Disclosing Party's request.

7. No License: Nothing in this Agreement is intended to grant any rights to either party under any patent, mask work right or copyright of Company, nor shall this

34



Agreement grant Receiving Party any rights in or to Confidential Information except as expressly set forth herein.

8. Term: This Agreement shall survive for a period of 3 years from the date of disclosure of the Confidential Information.

9. Remedies: The Receiving Party agrees that any violation or threatened violation of this Agreement will cause irreparable injury to the Disclosing Party, entitling the Disclosing Party to obtain injunctive relief in addition to all legal remedies.

10. Miscellaneous: This Agreement shall bind and inure to the benefit of the parties hereto and their successors and assigns. This Agreement shall be governed by the laws of the State of the Company without reference to conflict of laws principles. This document contains the entire agreement between the parties with respect to the subject matter hereof. Any failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision hereof. This Agreement may not be amended, nor any obligation waived, except by a writing signed by both parties hereto. Any and all disputes arising under or related to this Agreement shall be adjudicated exclusively in the State of the Company.

The parties have executed this Nondisclosure Agreement as of the date written below.

COMPANY                           CO - PACKER

By:_____             By:_____

Name: _____            Name:_____

Title:_____            Title: _____

Date: _____            Date: _____

35

**Exhibit 5.5**
**ANNUAL PRODUCT SALES GOAL -- 2011**
**PALLETS/REVENUE PLAN: BASE CASE**

ISG CONFIDENTIAL

| SKU | AREA | JAN VOL | JAN REV ($$) | FEB VOL | FEB REV ($$) | MAR VOL | MAR REV ($$) | APR VOL | APR REV ($$) | MAY VOL | MAY REV ($$) | JUN VOL | JUN REV ($$) | JUL VOL | JUL REV ($$) | AUG VOL | AUG REV ($$) | SEP VOL | SEP REV ($$) | OCT VOL | OCT REV ($$) | NOV VOL | NOV REV ($$) | DEC VOL | DEC REV ($$) | 2011 ($$) | 2010 ($$) | 2010 ($$) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BF 8OZ Naranja | NE | 8 | 8.8 | 8 | 8.8 | 10 | 10.9 | 11 | 12.0 | 12 | 13.1 | 13 | 13.1 | 15 | 16.4 | 15 | 16.4 | 13 | 14.2 | 12 | 13.1 | 11 | 12.0 | 10 | 10.9 | 12.6 | 0.0 | 10.3 |
| | M-A | 2 | 2.2 | 3 | 3.3 | 3 | 3.3 | 3 | 3.3 | 3 | 3.3 | 3 | 3.3 | 5 | 5.5 | 5 | 5.5 | 4 | 4.4 | 3 | 3.3 | 3 | 3.3 | 3 | 3.3 | 3.6 | 0.0 | 0.6 |
| | CHI | 3 | 2.8 | 3 | 2.8 | 3 | 2.8 | 3 | 2.8 | 3 | 2.8 | 4 | 3.7 | 5 | 4.6 | 5 | 4.6 | 4 | 3.7 | 3 | 2.8 | 3 | 2.8 | 3 | 2.8 | 3.2 | 0.0 | 1.1 |
| BF PINT Naranja | NE | 3 | 2.7 | 3 | 2.7 | 3 | 2.7 | 3 | 2.7 | 4 | 3.6 | 4 | 3.6 | 4 | 3.6 | 4 | 3.6 | 4 | 3.6 | 3 | 2.7 | 3 | 2.7 | 3 | 2.7 | 3.1 | 0.0 | 2.3 |
| | M-A | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0.0 | 0.0 | 0.3 |
| | CHI | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0.0 | 0.0 | 0.3 |
| BF QUART Naranja | NE | 3 | 2.1 | 3 | 2.1 | 3 | 2.1 | 3 | 2.1 | 4 | 2.8 | 4 | 2.8 | 4 | 2.8 | 4 | 2.8 | 4 | 2.8 | 3 | 2.1 | 3 | 2.1 | 3 | 2.1 | 2.4 | 0.0 | 1.4 |
| | M-A | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | CHI | 5 | 3.1 | 5 | 3.1 | 5 | 3.1 | 5 | 3.1 | 5 | 3.1 | 7 | 4.9 | 8 | 4.9 | 8 | 4.9 | 5 | 4.9 | 5 | 3.1 | 5 | 3.1 | 5 | 2.6 | 3.7 | 0.0 | 0.3 |
| BF 64OZ SQ Naranja | NE | 5 | 2.6 | 5 | 2.6 | 6 | 2.6 | 6 | 3.2 | 6 | 3.2 | 7 | 3.7 | 7 | 3.7 | 7 | 3.7 | 7 | 3.7 | 6 | 3.2 | 6 | 3.2 | 5 | 2.6 | 3.2 | 0.0 | 9.3 |
| | M-A | 0 | 0.0 | 2 | 1.1 | 2 | 1.1 | 2 | 1.1 | 2 | 1.1 | 2 | 1.1 | 2 | 1.1 | 2 | 1.1 | 2 | 1.1 | 2 | 1.1 | 2 | 1.1 | 2 | 1.1 | 1.3 | 0.0 | 0.3 |
| | CHI | 0 | 0.0 | 2 | 0.9 | 2 | 0.9 | 2 | 0.9 | 3 | 1.4 | 3 | 1.4 | 4 | 1.9 | 4 | 1.9 | 3 | 1.4 | 3 | 1.4 | 3 | 1.4 | 3 | 1.4 | 1.3 | 0.0 | 0.7 |
| SUBTOTAL - Naranja = | | 29.0 | 24.2 | 34.0 | 27.3 | 36.0 | 29.5 | 39.0 | 31.6 | 42.0 | 34.3 | 48.0 | 38.2 | 56.0 | 45.5 | 56.0 | 45.5 | 50.0 | 40.3 | 41.0 | 33.2 | 40.0 | 32.1 | 38.0 | 30.5 | 34.4 | 26.9 | 32.2 |
| # of Other Flavors of Sonrisa = | | 1 | | 1 | | 3 | | 3 | | 5 | | 5 | | 5 | | 5 | | 5 | | 5 | | 5 | | 5 | | | | |
| BF 8OZ Other Flavors | NE | 5 | 5.5 | 1.8 | 1.8 | 6 | 6.6 | 11 | 12.0 | 12 | 13.1 | 13 | 13.1 | 15 | 16.4 | 15 | 16.4 | 13 | 14.2 | 11 | 13.1 | 11 | 12.0 | 10 | 10.9 | 11.4 | 0.2 | 0.8 |
| | M-A | 1 | 1.1 | 0.6 | 0.7 | 1.8 | 2.0 | 3 | 3.3 | 3 | 3.3 | 3 | 3.3 | 5 | 5.5 | 5 | 5.5 | 3 | 4.4 | 3 | 3.3 | 3 | 3.3 | 3 | 3.3 | 3.2 | 0.0 | 0.0 |
| | CHI | 3 | 2.8 | 0.6 | 0.6 | 1.8 | 1.7 | 3 | 2.8 | 3 | 2.8 | 4 | 3.7 | 5 | 4.6 | 5 | 4.6 | 3 | 3.7 | 3 | 2.8 | 3 | 2.8 | 3 | 2.8 | 2.8 | 0.0 | 0.0 |
| BF 64OZ Other Flavors | NE | 2 | 1.1 | 0.5 | 0.5 | 3 | 1.6 | 6 | 3.2 | 6 | 3.2 | 7 | 3.7 | 7 | 3.7 | 7 | 3.7 | 7 | 3.7 | 6 | 3.2 | 6 | 3.2 | 5 | 1.6 | 1.7 | 0.0 | 0.0 |
| | M-A | 0 | 0.0 | 0.2 | 0.4 | 2 | 0.6 | 2 | 1.1 | 2 | 1.1 | 2 | 1.1 | 4 | 2.1 | 4 | 2.1 | 2 | 2.1 | 3 | 1.6 | 3 | 1.6 | 3 | 1.4 | 1.2 | 0.0 | 0.8 |
| | CHI | 2 | 0.9 | 0.4 | 0.2 | 2 | 0.6 | 2 | 1.4 | 3 | 1.4 | 3 | 1.4 | 4 | 1.9 | 4 | 1.9 | 3 | 1.9 | 3 | 1.4 | 3 | 1.4 | 3 | 2.6 | 22.8 | 0.2 | 0.8 |
| SUBTOTAL Other Flavors = | | 13.0 | 11.3 | 4.6 | 3.9 | 15.0 | 13.0 | 28.0 | 28.0 | 29.0 | 29.0 | 33.0 | 27.3 | 40.0 | 34.3 | 40.0 | 34.3 | 34.0 | 28.9 | 30.0 | 25.3 | 29.0 | 24.2 | 27.0 | 22.6 | 22.8 | 0.0 | 34.3 |
| Chipilo Crema = | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.8 | 1.2 |
| TOTAL SALES GOAL BY MONTH: Pallets/Revenue = | | 42.0 | 35.5 | 38.6 | 31.2 | 51.0 | 42.5 | 67.0 | 58.6 | 73.0 | 63.3 | 81.0 | 65.5 | 96.0 | 54.0 | 96.0 | 54.0 | 84.0 | 69.2 | 73.0 | 58.5 | 69.0 | 56.3 | 65.0 | 53.1 | 57.2 | | 34.3 |
| MTD ACTUAL Pallets/Revenue = | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TOTAL SALES GOAL YTD: Pallets/Revenue = | | 42.0 | 35.5 | 80.6 | 66.7 | 131.6 | 109.2 | 198.6 | 196.0 | 271.6 | 239.3 | 348.6 | 289.5 | 445.0 | 360.0 | 541.6 | 448.0 | 625.6 | 518.0 | 698.6 | 575.5 | 767.6 | 631.9 | 830.6 | 685.0 | | | |
| YTD ACTUAL Pallets/Revenue = | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

**ANNUAL 2011 PRODUCT SALES GOAL = $686,000**

**Exhibit 5.5**

**ANNUAL PRODUCT SALES GOAL ASSUMPTIONS – 2011**

1 Existing Distributors and Co-Packers remain viable; costs and pricing remain consistent with the past.

2 Products remain competitive.

3 Financing becomes available to support projected growth.

4 IFG is permitted to operate freely in its existing business area -- Greater New York south to the Carolinas and Greater Chicago.

5 IFG's distributors are permitted to operate freely outside of their base territory as long as they are not selling in someone else's exclusive territory.

6 Orange volumes are not impacted by new flavors...new flavors equal growth.

7 Orange & Grape Bonafina through February, then add two more flavors in March and two more in April and one more in May. Average % of Orange volume for each othe flavor = 20%

8 There are no interruptions of significance in the ability to produce or transport UF products.