UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X

INCREDIBLE FOODS GROUP, LLC,

                Plaintiff,

  -against-

UNIFOODS, S.A. de C.V.,

                Defendant.

-------------------------------------X

**MEMORANDUM AND ORDER**

14-CV-5207 (KAM)(JO)

**MATSUMOTO, United States District Judge:**

      On September 5, 2014, plaintiff Incredible Food Groups, LLC ("IFG" or "plaintiff") brought this action against defendant Unifoods, S.A. de C.V. ("UF" or "defendant") to vacate in part the arbitration award in *Incredible Foods Group, LLC v. Unifoods, S.A. de C.V.*, Case No. 50 467 T 01010 13 (the "Arbitration") (the "Award") pursuant to 9 U.S.C. § 10. Defendant opposes plaintiff's request to vacate and seeks confirmation of the Award, entry of judgment and attorney's fees. For the reasons set forth below, plaintiff's motion to vacate in part the Award is denied, and the Award is confirmed.[1]

---

[1] The court notes that IFG and counter-defendant iSell Unlimited LLC ("iSell") have objected to Judge Orenstein's April 19, 2015 Order (ECF No. 24) granting defendant's motion to join iSell as a successor-in-interest to IFG. (Appeal of Mag. Judge Decision, filed 9/2/15, ECF No. 26.) In light of the fact that the legal and factual issues are distinct, the court declines to address the appeal in this Memorandum and Order. An Order addressing the objections is forthcoming.

1

## I. Background[2]

Plaintiff IFG is a Connecticut Limited Liability Company with its principal place of business in Stamford, Connecticut. (Petition to Vacate in Part Arbitration Award ("Petition"), ECF No. 1-2, Ex. B ("Final Award") ¶ 1.) Defendant UF is a Mexican corporation with its principal place of business in Mexico City, Mexico. (*Id*. ¶ 2.) IFG, as sub-licensee, and UF, as sub-licensor, are parties to a Sub-License Agreement (the "Agreement"), dated and effective as of January 1, 2009 and executed in November 2011. (*Id*. ¶ 3.) Pursuant to the Agreement, IFG is licensed to "manufacture, market, distribute and sell" a fruit beverage named Bonafina[3] in New York, New Jersey, Connecticut, Delaware, eastern Pennsylvania, and metropolitan Chicago, IL. (*Id*.)

### A. The Bonafina Problem

Pursuant to Paragraphs 3.1[4] and 4.1[5] of the Agreement, IFG identified a potential U.S. manufacturer, Diamond Drinks,

---

[2] The court summarizes the relevant facts to the instant action as represented in plaintiff's petition and the attached exhibits – specifically, the Agreement (Exhibit A) and the Final Arbitration Award (Exhibit B). The parties do not dispute any of the facts relevant to the issues in this case.

[3] UF has the license to manufacture and market Bonafina under trade names and registered trademarks owned by Productos de Leche, S.A. de C.V. ("PDL"), a Mexican corporation. (Petition, Ex. B (Final Award) ¶ 3.)

[4] As provided under the heading "3. Duties of Sub-Licensee – US Manufacturing":
> 3.1 US Manufacturers. Sub-Licensee will identify potential US Manufacturers for Sub-Licensor's approval who are capable of producing the UF Products at a level of quality consistent with and subject to the quality control and product specifications

2

Inc. of Williamsport, PA ("Diamond") to manufacture the Bonafina beverage. (Petition, Ex. B (Final Award) ¶ 16; Mem. of Law of Pl. in Support of Mot. to Vacate Arbitration Award in Part ("Pl.'s Mem."), ECF No. 15-3 at 3-4.) UF, "in its sole discretion" as the sub-licensor, approved Diamond as a U.S. Manufacturer of Bonafina under Paragraph 4.1 of the Agreement. (Petition, Ex. B (Final Award) ¶ 36; Pl.'s Mem. at 4.)

Pursuant to Paragraph 4.3[6] of the Agreement, UF provided Diamond with the specifications and recipes to produce the Bonafina product. (*Id*.) Shortly after Diamond began manufacturing Bonafina in 2011, some, but not all, of the bottles of Bonafina manufactured by Diamond "bulged and leaked after remaining unsold on retailers' shelves for a period of months," causing customers to lose interest in stocking the

---

established by PDL and Sub-Licensor related to the UF Products in Mexico and as adapted as necessary to satisfy unique US requirements ("the Quality Controls and Product Specifications") as described in Exhibit 3. I. Within thirty (30) days of its identification and after inspection and evaluation, Sub-Licensor shall, in its sole discretion, approve or deny the Sub-Licensee's use of any potential US manufacturer so identified. (Petition, ECF No. 1-1, Ex. A ("Agreement") ¶¶ 3-3.1.)

[5] As provided under the heading "4. Duties of Sub-Licensor – US Manufacturing":
    4.1 Approval of U.S Manufacturers. Sub-Licensor will review, including an on-site inspection of any proposed US Manufacturer, and approve, in its sole discretion, those US Manufacturers recommended by the Sub-Licensee that are able to meet the Quality Control standards and Product Specifications and comply with the Protective Clauses. (Petition, ECF No. 1-1, Ex. A (Agreement) ¶¶ 4-4.1.)

[6] As provided under the heading "4. Duties of Sub-Licensor – US Manufacturing":
    4.3 Product Specifications. Sub-Licensor will provide approved US Manufacturers with specifications and recipes ("Product Specifications") such that the US Manufacturers can produce UF Products consistent with UF standards.

3

product. (*Id.* ¶¶ 16-17.) IFG and UF investigated various approaches to diagnosing and curing the problem. (*Id.* ¶ 17.) Ultimately, an outside consultant determined that the problem was the result of a chemical reaction between the mixture of yeast present at the Diamond facility and calcium lactate, an ingredient in the Bonafina recipe. (*Id.*) After the Bonafina recipe was changed to eliminate calcium lactate in July 2013, the problem was resolved. (*Id.* ¶¶ 17-18.)

**B. The Arbitration**

Pursuant to the Paragraph 25 of the Agreement, IFG commenced arbitration on October 23, 2013, alleging "two sets of breaches"[7] of the Agreement by UF. (Petition, Ex. B (Final Award) ¶¶ 10-11.) IFG alleged that UF's breaches resulted in damages totaling $47,582,110 in lost sales. (*Id.* ¶ 18.) UF denied responsibility for the Bonafina difficulties and contends that IFG was an inexperienced and undercapitalized Sub-Licensee that bears the risk of the business it entered. (*Id.* ¶ 19.) UF counterclaimed for recovery of funds that it loaned to IFG and the unpaid price of goods purchased from UF by IFG in the amount of $578,599.27 and fees. (*Id.* ¶ 20.) UF also sought a declaration that it is entitled to terminate the Agreement due to material breaches by IFG. (*Id.* ¶ 21.)

---
[7] At this time, plaintiff seeks to vacate only the portion of Award relating to the manufacturing of the Bonafina product. (*See* Petition ¶ 1.) Consequently, the court declines to summarize the facts relating to the Chipilo difficulties.

4

Based upon the record before him, which included testimony from a three-day hearing and pre- and post-hearing submissions, the Arbitrator denied IFG's claims in their entirety and awarded damages and fees to defendant UF.[8] (*Id.* ¶¶ 22, 53.) The Arbitrator found that IFG failed to establish that any action or omission by UF with respect to Bonafina breached the Agreement or caused IFG any damage. (*Id.* ¶ 42.)

In stating the reasons for his decision, the Arbitrator first made the following findings based on the record: (1) IFG began its relationship with UF "without material experience in the food manufacturing or distribution industry and without substantial working capital" (*id.* ¶ 24); (2) the Agreement recognized that the process to transplant recipes for products manufactured and sold in Mexico to the United States would not be automatic, citing Paragraph 3.1 (*id.* ¶ 25); (3) the Agreement allocated primary responsibility for management of the U.S. Manufacturers, such as Diamond, to IFG, citing Paragraphs 3.3[9], 3.4[10], and 3.6[11] (*id.* ¶ 26); and UF's

---

[8] The Arbitrator also awarded UF $379,000 in damages and $154,504.56 in attorney's fees (and accrued interest). (Petition, Ex. B (Final Award) ¶ 55.) The Arbitrator furthermore terminated the Agreement and found IFG must bear the administrative fees and expenses of arbitration. (*Id.* ¶¶ 56-57.)

[9] As provided under the heading "3. Duties of Sub-Licensee – US Manufacturing":
> 3.3 US Manufacturers Interface. Sub-Licensee will be responsible for interfacing with approved US Manufacturers for which it is responsible and coordinating all operational activities related to the manufacture, production, distribution and sale of the UF Products sold to its Customers within the Territory. (Petition, ECF No. 1-1, Ex. A (Agreement) ¶¶ 3, 3.3.)

5

responsibilities for the manufacturing and quality of products in the United States were limited, citing Paragraphs 3.3, 3.6, 4.1, 4.3, and 4.5[12] (*id.* ¶¶ 27-28).

The Arbitrator also addressed and rejected IFG's specific arguments relating to the Bonafina complications. IFG argued, as it also does here, that UF breached the Agreement by (1) providing a defective recipe and (2) by approving the Diamond bottling plant without recognizing that yeast might be present in the ambient atmosphere. (*Id.* ¶ 36.) The Arbitrator found that "UF did not breach the Agreement by

---

[10] As provided under the heading "3. Duties of Sub-Licensee – US Manufacturing":
> 3.4 Monitoring US Manufacturers. Sub-Licensee shall use commercially reasonable efforts (efforts that are usual and normal for a company acting in good faith to do in a similar situation, including periodic visits to the US Manufacturer's work place and will promptly conduct an investigation should Sub-Licensee become aware of any facts evidencing the need for such investigation) in monitoring the activities of US Manufacturers. Sub-Licensee shall notify Sub-Licensor, immediately, of any potential issues prior to taking specific action, to assure that the Sub-Licensor's interests are protected and the Quality Controls, Product Specifications and Protective Clauses are enforced. (Petition, ECF No. 1-1, Ex. A (Agreement) ¶¶ 3, 3.4.)

[11] As provided under the heading "3. Duties of Sub-Licensee – US Manufacturing":
> 3.6 Preventive Measures. The US Manufacturer's Agreements will provide that Sub-Licensee and the US Manufacturer will exert their collective and individual commercially reasonable efforts to prevent, troubleshoot and resolve any problems arising from the US Manufacturers' performance under the US Manufacturer's Agreement. Sub-Licensee will advise Sub-Licensor of any problems which may have significant economic impact and receive any input which Sub-Licensor may offer. (Petition, ECF No. 1-1, Ex. A (Agreement) ¶¶ 3, 3.6.)

[12] As provided under the heading "4. Duties of Sub-Licensor – US Manufacturing":
> 4.5 Compliance with Quality Contents. Sub-Licensor may conduct periodic plant visits, as needed, to review a co-packer's records to assure that required Quality Controls and Product Specifications and Protective Clauses are continually met.

6

approving the Diamond plant, nor was there anything inherently wrong with the Bonafina recipe given to Diamond." (*Id*. ¶ 38.) The Arbitrator noted that no expert evidence was submitted concerning the "actual cause" of the Bonfina bulges and leaks, "but it appears that the contamination may have been particular to some of the bottling equipment used or bottles manufactured by Diamond." (*Id*.) The Arbitrator also found that UF did not violate the Agreement by "by proving unable to diagnose the problem for what became a rather lengthy period" because the contamination in the manufacturing operations was a problem for IFG to troubleshoot. (*Id*. ¶ 39.) The Arbitrator reasoned that just because the bulging and leaking bottle issue appears to have been resolved by a recipe change "does not mean that there was anything defective in the original recipe." (*Id*.) Additionally, the Arbitrator found that IFG's damage claims were based on speculation and did not "provide a proper, stable basis" for an award of damages. (*Id*. ¶ 41.)

## II. Discussion

### A. Vacatur of the Award

Plaintiff moves to vacate the Award pursuant to the Section 10 of the Federal Arbitration Act (codified at 9 U.S.C. § 10) ("FAA"). (Petition at 1.) Specifically, plaintiff seeks to vacate the Award insofar as it fails to find that defendant violated Paragraph 4.3 of the Agreement. (*Id*.) Plaintiff

7

contends that because UF approved Diamond as the U.S. manufacturer of Bonafina and also provided the recipe that was used to manufacture Bonafina, the Arbitrator's determination fails "to draw its essence from the agreement." (Pl. Mem. at 5) (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).)

Defendant, in its opposition, requests confirmation of the Arbitration awarding damages and fees and terminating the Agreement, and entry of judgment pursuant to 9 U.S.C. § 9. (Resp.'s Brief in Opp. to Petitioner's Mot. to Vacate in Part Arbitration Award ("Def. Opp"), ECF No. 15-4, at 1.)

1. *Legal Standard*

In reviewing an arbitration award, a court "can confirm and/or vacate the award, either in whole or in part." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006). "Normally, confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Id*. at 110 (internal quotation marks omitted). The reviewing court "must grant" a petition to confirm an arbitration award unless the award is vacated, modified, or corrected as prescribed in 9 U.S.C. §§ 10 and 11. *Id.*; 9 U.S.C. § 9.

Pursuant to 9 U.S.C. § 10(a), a court may vacate an arbitration award on one of four grounds:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

In addition to the section 10(a) grounds for vacatur, the Second Circuit has "recognized a judicially-created ground, namely that an arbitral decision may be vacated when an arbitrator has exhibited a manifest disregard of law." *Jock v. Sterling Jewelers*, 646 F.3d 113, 121-22 (2d Cir. 2011)(internal quotation marks omitted).

Vacatur is appropriate under 9 U.S.C. § 10(a)(4) when an arbitrator's decision exceeds his powers. *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 754 F.3d 109, 112-13 (2d Cir. 2014); 9 U.S.C. § 10(a)(4). The Second Circuit has instructed that the "crux of the excess-of-powers standard is whether the arbitrator's award draws its essence" from the agreement. *Id*. (internal quotation marks omitted). The court's focus is "whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to

9

reach a certain issue, *not whether the arbitrators correctly decided that issue.*" *Jock*, 646 F.3d at 122-23 (emphasis in original)(quoting *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 824 (2d Cir. 1997)). Where, as here, "the challenge is to an award deciding a question which all concede to have been properly submitted to the arbitrator in the first instance, vacatur under the excess-of-powers standard is appropriate only in the narrowest of circumstances." *Am. Postal Workers Union*, 754 F.3d at 112-113 (internal quotation marks omitted).

The Supreme Court recently restated the limited scope of relief under § 10(a)(4):

> It is not enough to show that the arbitrator committed an error—or even a serious error. Because the parties bargained for the arbitrator's construction of their agreement, an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits. . . . So the sole question for [the court] is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong.

*Oxford Health Plans LLC v. Sutter*, --- U.S. ---, 133 S. Ct. 2064, 2068 (2013)(alterations, citations, and internal quotation marks omitted). Where, however, the arbitral decision lacks "*any* contractual basis" for its determination such that the decision "could not have been . . . based on a determination regarding the parties' intent," a court may

10

vacate the arbitrator's decision. *Id.* at 2069-70 (differentiating the Supreme Court's decision in *Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010) where it found proper vacatur of arbitrator's decision to permit class arbitration when parties expressly stipulated that they never reached an agreement regarding class arbitration).

   *2. Application*

Applying the well-settled law established by the Supreme Court and the Second Circuit, the court finds that the Arbitrator did not exceed the bounds of his authority pursuant to 10 U.S.C. § 10(a)(4).[13] The parties do not dispute that the issue of whether UF violated its duties pursuant to the Agreement with respect to the Bonafina problem was properly submitted to the Arbitrator. Rather, plaintiff's argument amounts to a disagreement with the Arbitrator over his interpretation of the Agreement. The law prohibits vacatur where the Arbitrator has interpreted the Agreement, whether correctly or incorrectly. *See Oxford Health Plans*, 133 S. Ct. at 2068; *Jock*, 646 F.3d at 122-23.

Here, as the court's summary of the Award demonstrates, the Arbitrator interpreted the Agreement, in light of the evidence in the record, to reach his conclusion as

---

[13] Federal district courts have original jurisdiction over the review of arbitration awards. 9 U.S.C. § 203. Venue in the Eastern District of New York is proper pursuant to Paragraph 19 of the Agreement. (Petition, ECF No. 1-1, Ex. A (Agreement) ¶ 19.)

11

to whether UF committed any breaches. The Arbitrator determined, based on the factual record and his textual analysis of the Agreement, that UF did not breach any of its duties under the Agreement. Specifically, the Arbitrator reasonably[14] determined that UF met its duties to provide "specifications and recipes" for the manufacture of Bonafina and to approve the U.S. manufacturers. The Arbitrator based his determination on the fact that (1) the recipe was not by its very nature defective and (2) that UF diligently inspected the Diamond facility and considered whether the facility had the ability to overcome potential contamination issues. (*See* Petition Ex. B (Final Award) ¶¶ 37, 39.)

That the Arbitrator did not find plaintiff's arguments compelling does not mean that the Arbitrator did not interpret the Agreement. Not only did the Arbitrator interpret the Agreement, but he considered and addressed plaintiff's specific arguments which plaintiff recycles here. *See* Petition Ex. B (Final Award) ¶¶ 38-39.) Plaintiff also fails to show under *Stolt-Nielson* that the Award is not supported by *any* contractual bases and fails to demonstrate that the arbitrator

---

[14] The court is well-aware that whether the Arbitrator's interpretation of the Agreement was reasonable is not the standard to be applied here. The court, however, does not find that plaintiff has even made a sufficient showing that the Arbitrator's decision was unreasonable.

exhibited a "manifest disregard of the law." *See Jock*, 646 F.3d at 121-22.[15]

Plaintiff's remaining arguments are premised upon the fact that, in plaintiff's view, it would defy "common sense" for the plaintiff to have been allocated the duty to ensure that the recipe "worked" when used by the selected U.S. Manufacturer. (*See, e.g.*, Pl.'s Mem. at 6; Reply Mem., ECF No. 15-5, at 7-8.) Plaintiff's argument is based on a fundamental misunderstanding of contractual duties – just because this duty may not have been entirely allocated to the plaintiff does not mean that it was necessarily the defendant's. Here, it appears, from the court's understanding of the facts and review of the Agreement that this type of manufacturing error – an unforeseen chemical reaction between a contaminant in the plant itself and a beverage ingredient – was not expressly contemplated by the Agreement and the court is not aware of any warranty provided by either party. What is clear from the Agreement is that plaintiff, as sub-licensee, had the duty to interface with all approved U.S. Manufacturers, coordinate all operational activities relating to the manufacture, production,

---

[15] In light of the Supreme Court's decision in *Oxford Health Plans* and the subsequent Second Circuit decision in *American Postal Workers*, the court is unsure of the viability of the "manifest disregard of law" as a ground upon which the court may vacate an arbitral decision. The court nonetheless considers the applicability of vacatur on this ground in the absence of any Second Circuit decision expressly rejecting the doctrine and finds that the arbitrator's award does not show a manifest disregard of law.

13

distribution and sale of the products (Petition, ECF No. 1-1, Ex. A (Agreement) ¶ 3.3) and monitor the activities of U.S. Manufacturers, to ensure controls, product specifications and protective clauses are enforced and promptly investigate any facts evidencing the need for investigation. (*Id.* ¶ 3.4.) Thus, the only relevant question is whether defendant breached any provisions of the contract, which the Arbitrator appropriately determined UF did not.

### B. Attorney's Fees

Defendant requests reasonable attorney's fees in the sum of $10,000 for opposing plaintiff's petition pursuant to Paragraph 32 of the Agreement. (Def. Opp. at 4.) The prevailing American rule is that each party in federal litigation pays his own attorney's fees absent statutory authorization or contractual agreement between the parties. *See, e.g.*, *In re Arbitration Before New York Stock Exchange, Inc.*, 04 Civ. 488, 2004 WL 2072460, at *14 (S.D.N.Y. Sept. 8, 2004). Although the FAA does not expressly authorize fee-shifting, *see id.*, the Agreement does authorize the losing party to pay the prevailing party a "reasonable sum" for fees and costs associated with "enforcing" an arbitration award. (Petition, Ex. B (Final Award) ¶ 3.)

Although the court finds that defendant is entitled to attorney's fees for opposing plaintiff's petition to vacate

14

in part the Award pursuant to the Agreement, the court finds that the requested $10,000 is not a reasonable sum. Defendant has failed to provide any indication of why the $10,000 sought is reasonable. Defendant has provided no contemporaneous time records in support of its request, as required by the Second Circuit. *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147 (2d Cir. 1983)("[A]ny attorney . . . who applies for court-ordered compensation in this Circuit for work done after the date of this opinion must document the application with contemporaneous time records. These records should specify, for each attorney, the date, the hours expended, and the nature of the work done.") The court notes that defendant's only submission in this matter is its four-page opposition brief.

Defendant's counsel may show cause in writing within 14 days and explain why the court should grant the full award of $10,000 in attorney's fees related to the instant action. Defendant's counsel should append contemporaneous time records providing counsel's hourly rate as well as a description of the work he performed and his experience and qualifications.

## Conclusion

For the foregoing reasons, plaintiff's petition to vacate in part the arbitration award is denied. The arbitration award is hereby CONFIRMED. The court directs the

15

Clerk of the Court to reserve entry of judgment until the objections to Judge Orenstein's decision are resolved.

**SO ORDERED.**

Dated:    September 29, 2015
          Brooklyn, New York

                                    _____/s/_____
                                     Kiyo A. Matsumoto
                                     United States District Judge